HAMILTON v. SECRETARY OF STATE.

1. CONSTITUTIONAL LAW—INITIATIVE—PETITION FOR SUBMISSION OF AMENDMENT—MINISTERIAL DUTY.

Where a petition to the secretary of State to submit to vote of the people a proposed amendment to the State Constitution under section 2, Art. 17, is conceded to be proper in form and to contain the required number of signatures, it is his duty to place said proposed amendment upon the ballot at the forthcoming election, and he may not question the constitutionality of said amendment or refuse to

On mandamus to compel delivery of copy or to require promulgation of act passed by the legislature, see note in 22 L. R. A. (N. S.) 1089.

submit it because in his judgment it may be in conflict with the Federal Constitution; his duties in connection therewith being ministerial and not judicial.

2. SAME—CONSTITUTIONALITY OF PROPOSED AMENDMENT NOT BE-FORE COURT.

Said amendment not having yet been voted upon by the people, the question of its constitutionality is not before the court, and will not be passed upon until it is properly presented.

3. SAME—JUDICIAL VETO.

To exercise the power of judicial veto against the constitutionality of an amendment before its adoption, or a law before its enactment, finds no justification in necessity, and is an unwarranted assumption by the courts of the power reserved to the people in the Constitution or conferred by it on the legislature.

4. MANDAMUS — CONSTITUTIONAL AMENDMENT — DISCRETION OF COURT TO COMPEL SUBMISSION.

In mandamus proceedings to compel the secretary of State to place a constitutional amendment upon the ballot, the Supreme Court has no discretion to refuse the writ, the duty of said officer, when the petition is in proper form and sufficient, to submit said amendment being plainly prescribed by law, and in such case mandamus is no more matter of discretion than any other remedy.

BROOKE, FELLOWS, and CLARK, JJ., dissenting.

Mandamus by James Hamilton to compel Coleman C. Vaughan, secretary of State, to submit a proposed amendment to the Constitution. Submitted October 1, 1920. (Calendar No. 29,334.) Writ granted October 1, 1920.

*Moore & Moore*, for plaintiff.

*Alex. J. Groesbeck*, Attorney General, and *Clare Retan*, Assistant Attorney General (*H. E. Spalding*, of counsel), for defendant.

*Diekema, Kollen & Ten Cate* and *J. C. Lehr*, amici curiæ.

MOORE, C. J.   This is a proceeding instituted by plaintiff to compel defendant to submit to the electors at the general November election a proposed amendment to the Constitution of this State.  Pursuant to the provisions of the State Constitution initiatory petitions, signed by plaintiff and others, were filed in the office of defendant proposing an amendment to the Constitution of this State, which amendment reads as follows:

"SECTION 16. All residents of the State of Michigan, between the ages of five years and sixteen years, shall attend the public school in their respective districts until they have graduated from the eighth grade: Provided, That in districts where the grades do not reach the eighth, then all persons herein described in such district shall complete the course taught therein.

"SEC. 17. The legislature shall enact all necessary legislation to render section sixteen effective."

The defendant being advised by the attorney general that the proposed amendment was in conflict with the Constitution of the United States, and should not be submitted to the electors at the general November election, notified plaintiff that he would not submit the same, whereupon plaintiff made application to this court for a writ of mandamus to compel defendant to place the proposed amendment upon the ballot at the November election.

It is contended on the part of the defendant that the proposed amendment is invalid for the following reasons:

"(1) It is in conflict with the 14th Amendment to the Constitution of the United States, in that it abridges the privileges and immunities of citizens of the United States.

"(2) It violates the 14th Amendment to the Constitution of the United States, in that it deprives persons of their liberty and property without due process of law.

212—Mich.—3.

"(3) It violates section 4 of article 5 of the Constitution of the United States, which guarantees to every State in the Union a republican form of government.

"(4) In addition to the foregoing, another proposition is herein involved, viz., the duty of the secretary of State to submit the proposed amendment to the electors, although the same is in conflict with the Constitution of the United States."

Each of the above propositions is argued at length and with great ability. We are of the opinion that it is not our duty at this time to determine these questions.

It is conceded that a petition with the proper number of signatures was in February, 1920, filed with the defendant to make it his duty to submit the proposed constitutional amendment to the people at the November election, if the proposed amendment is not in conflict with the Federal Constitution. No one knows to any certainty whether if the amendment is submitted to the legal electors it will receive a sufficient number of votes to carry it. If it does not receive such a number of votes no one is harmed.

If the defendant in this case may decide whether the proposed amendment is constitutional and thus refuse to submit it, May he not in any case in which it is his judgment that the proposed amendment is unconstitutional, decline to submit it? If he may exercise this power, Is not he going much farther than his duties as a ministerial officer authorize him to go? If the proposed amendment should receive a majority of the legal votes cast, there will then be time enough to inquire whether any provision of the Federal Constitution has been violated. Until that time comes we must decline to express any opinion as to the unconstitutionality of the proposed amendment.

It is claimed on the part of the defendant that the question is foreclosed by *Scott* v. *Secretary of State*,

202 Mich. 629; *Hamilton* v. *Secretary of State,* 204 Mich. 439; *Hamilton* v. *Secretary of State,* 206 Mich. 371; and *Decher* v. *Secretary of State,* 209 Mich. 565.

Without discussing those cases in detail, we think a reading of the opinions therein will show them to be easily distinguished from the instant case and that they are not inconsistent with this opinion.

We think it the duty of the defendant to submit the proposed amendment, and it is so ordered. Other opinions may be filed later.

STEERE, STONE, BIRD, and SHARPE, JJ., concurred with MOORE, C. J.

SHARPE, J.* I concur in the opinion of the Chief Justice, holding that the constitutionality of the proposed amendment is not before us for decision. While the conclusion reached by him is tersely stated, the time permitted in its preparation prevented any lengthy discussion of the question presented. Its importance prompts me to express at greater length my views on the subject.

The provision as to amendments to the Constitution (Art. 17) by the initiative and referendum reads as follows:

"SEC. 2. Amendments may also be proposed to this Constitution by petition of the qualified voters of this State. Every such petition shall include the full text of the amendment so proposed, and be signed by not less than ten per cent. of the legal voters of the State. Initiative petitions proposing an amendment to this Constitution shall be filed with the secretary of State at least four months before the election at which such proposed amendment is to be voted upon. Upon receipt of such petition by the secretary of State he shall canvass the same to ascertain if such petition has been signed by the requisite number of qualified electors, and if the same has been so signed, the proposed amendment shall be submitted to the electors at the

*Filed October 15, 1920.

next regular election at which any State officer is to be elected. Any constitutional amendment initiated by the people as herein provided shall take effect and become a part of the Constitution if the same shall be approved by a majority of the electors voting thereon and not otherwise. Every amendment shall take effect thirty days after the election at which it is approved. The total number of votes cast for governor at the regular election last preceding the filing of any petition proposing an amendment to the Constitution, shall be the basis upon which the number of legal voters necessary to sign such a petition shall be computed. *The secretary of State shall submit all proposed amendments to the Constitution initiated by the people for adoption or rejection in compliance herewith.* The petition shall consist of sheets in such form and having printed or written at the top thereof such heading as shall be designated or prescribed by the secretary of State. Such petition shall be signed by qualified voters in person only with the residence address of such persons and the date of signing the same. To each of such petitions, which may consist of one or more sheets, shall be attached the affidavit of the elector circulating the same, stating that each signature thereto is the genuine signature of the person signing the same, and that to the best knowledge and belief of the affiant each person signing the petition was at the time of signing a qualified elector. Such petition so verified shall be *prima facie* evidence that the signatures thereon are genuine, and that the persons signing the same are qualified electors. The text of all amendments to be submitted shall be published as constitutional amendments are now required to be published."

The only ground suggested for denying the writ is the unconstitutionality of the proposed amendment. To that end this court is asked to determine an issue upon an abstract legal question not based upon or arising out of any existing law or fact—in effect to halt proposed legislation pending its adoption and to exercise its exceptional power of judicial veto against an amendment of our Constitution which has not been

adopted and never may be.    In *Richardson* v. *McChesney*, 218 U. S. 487 (31 Sup. Ct. 43), it is said:

"The duty of the court is limited to the decision of actual pending controversies and it should not pronounce judgment upon abstract questions, however such opinion might influence future action in like circumstances."

Many other utterances to the same effect by courts of last resort, both State and Federal, will be found marshaled in the prevailing opinion in *Anway* v. *Railway Co.*, 211 Mich. 592, handed down September 30, 1920, in which this court held that the legislature had no power or authority under our Constitution to require courts to hear controversies and render advisory judgments or decrees declaratory of the rights of parties, unless the court in such a proceeding may enforce such judgment or decree by mandatory process or execution.

The rule stated in the *McChesney Case* is particularly applicable to the proposition here presented. The power of judicial veto is based upon no constitutional provision directly conferring it, but arises only from the impelling logic of our system of government providing for a distinctively judicial department as one of its three co-ordinate branches, created for the exclusive exercise of judicial functions. The authorized powers and duties of its courts are to hear and determine legal controversies as presented, and in that connection to construe, interpret and administer the law. When in the exercise of its judicial functions and required to decide a controversy in conformity with existing law, the court, as sometimes occurs, may find itself confronted with the necessity of choosing between two applicable but conflicting laws, one a constitutional provision adopted by the people, in whom rests the sovereign power, and the other an enactment of the legislative body which owes its existence to the

Constitution, one must be set aside. Such a situation necessitates, and authorizes, the court to reject the secondary law emanating from the legislature if in conflict with limitations imposed by the Constitution adopted by the people. No such condition or necessity confronts the court in this proceeding. To exercise the power of judicial veto against the constitutionality of an amendment before its adoption or a law before its enactment finds no justification in necessity, and is an unwarranted assumption by the courts of the power reserved to the people in the Constitution or conferred by it on the legislature.

The duty of the secretary of State is plainly prescribed. He "shall submit all proposed amendments * * * initiated by the people for adoption or rejection in compliance herewith." Upon the filing of the petition, the duty devolves on him to ascertain whether it complies with the constitutional requirements. He must canvass the same and determine whether it has been signed by the requisite number of qualified voters and also whether it is in the form prescribed and is properly verified. There is no provision that he shall determine whether the amendment contravenes any provision of the Federal Constitution, nor is he required or directed to submit such question to the attorney general for decision. The duty imposed is purely a ministerial one and his performance of it is made mandatory by the express language of the provision which is italicized.

Should he determine that the requirements for submission as contained in this section have not been complied with, he may refuse to submit it. If it is claimed that he is in error in the determination thus reached, his action may be reviewed in this court.

The cases relied on by counsel for the defendant: *Scott* v. *Secretary of State*, 202 Mich. 629; *Hamilton* v. *Secretary of State*, 204 Mich. 439; and *Hamilton* v.

*Secretary of State*, 206 Mich. 371, illustrate the questions which can be thus raised.   In the *Scott Case*, the question presented was whether the proposed amendment was sufficient in form, it being the claim of the defendant that the full text of the proposed amendment was not contained in the petition.   This court held that such infirmity existed, that it did not comply with the constitutional requirement that "Every such petition shall include the full text of the amendment so proposed."   The question of the validity of the proposed amendment was not discussed or passed upon by the court.   The ministerial duty of the secretary of State in relation to such petitions and the limits of the court's jurisdiction in the premises are stated in a carefully considered opinion by Chief Justice OSTRANDER as follows:

"Of the right of qualified voters of the State to propose amendments to the Constitution by petition it may be said, generally, that it can be interfered with neither by the legislature, the courts, nor the officers charged with any duty in the premises.   But the right is to be exercised in a certain way and according to certain conditions, the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution."

He then quotes that part of section 2 which prescribes the duty of the secretary of State when the petition is received by him, and adds:

"*Such Petition.*   A petition including the full text of the amendment so proposed, signed by not less than ten per cent. of the legal voters of the State.   The ascertainment of these facts which are to appear before he is charged with the performance of further duties involves the exercise of no discretion, the performance of none but a ministerial duty.   The performance of a purely ministerial duty may involve something more than doing a prescribed thing in a prescribed way. Knowledge of the correlation of facts, the exercise of reason, the application of established principles and

rules may be required before performance of a duty is indicated, before the fact upon the existence of which the duty arises can be said to be established. One must appreciate the meaning and effect of what appears upon the face of a petition before he can determine whether, upon its face, it imports one thing or another. As he might be compelled by mandamus to receive a proper petition, so by mandamus he may be compelled to refuse to receive an improper petition, since it is his duty to reject, at least to refuse to take further action concerning, petitions not conforming to the constitutional mandate. The jurisdiction of the court in the premises cannot be doubted, exercised within the limits herein indicated. *Rich* v. *Board of State Canvassers*, 100 Mich. 453; *Livingstone* v. *Wayne Election Commissioners*, 174 Mich. 485; *Thompson* v. *Secretary of State*, 192 Mich. 512, 521, 522."

In the first *Hamilton Case* the secretary of State had refused to submit the proposed amendment for the reason that his canvass determined that a sufficient number of names of qualified voters was not signed to the petition. The real question presented was whether the names of the signers who were women should be counted. This depended upon when the suffrage amendment became effective, on November 5, 1918, or thirty days thereafter. While the determination of this question was a matter of law, its decision in no way affected the validity of the legislation proposed but was necessary to ascertain a fact, to-wit, whether the necessary number of names of qualified voters was signed to the petition.

In the second *Hamilton Case* it appeared that after the decision in the first case additional petitions were filed with the secretary of State. These he refused to consider, and in this he was sustained by this court, it holding that the petition could not afterwards be supplemented, that it had "performed its office and as a petition, in view of the law, is dead."

In none of these cases do we find even a suggestion that in the performance of the ministerial duty imposed on him by the Constitution the defendant may decide a constitutional question. In determining whether the petition is sufficient in form and in ascertaining whether the names of a sufficient number of voters are signed thereto, he may be required to interpret the language of the constitutional provision, but it is a novel proposition in the science of jurisprudence to say that he may pass upon the constitutionality of the amendment proposed.

The views herein expressed find support in the following cases: *State, ex rel. Bullard,* v. *Osborn,* 16 Ariz. 247 (143 Pac. 117) ; *Pfeifer* v. *Graves,* 88 Ohio St. 473 (104 N. E. 529) ; *State, ex rel. Griffiths,* v. *Superior Court,* 92 Wash. 44 (159 Pac. 101, 162 Pac. 360) ; *Capito* v. *Topping,* 65 W. Va. 587 (64 S. E. 845, 22 L. R. A. [N. S.] 1089) ; *Treadgill* v. *Cross,* 26 Okla. 403 (109 Pac. 558, 138 Am. St. Rep. 964). In the last of these it is said:

"The people of the State in the exercise of their legislative power to amend the Constitution have not yet expressed their opinion of the proposed amendment. They will do that at the election to be held thereon. If in the exercise of their legislative discretion they conclude that the proposed amendment violates any valid compact with the Federal government or any provision of the Federal Constitution, they will no doubt in the observance of the duties of good citizenship, for that reason alone, reject the measure. If, on the other hand, they determine it to be a valid measure and adopt it, then, and not until then, will the judicial and executive departments have the power and duty devolving upon them to determine its validity and enforce its provisions."

Counsel further claim that the jurisdictional question herein involved is controlled by the case of *Decher* v. *Secretary of State,* 209 Mich. 565. It is perhaps a sufficient answer to say that the jurisdiction of the

court to hear and determine was not questioned, considered or passed upon in that case. But, assuming it to have been the duty of the court to raise it, we are of the opinion that it is in no way controlling. In that case this court held that the right of review reserved by the referendum in our Constitution did not apply to the action of the legislature in ratifying the 18th Amendment to the Federal Constitution, *first*, because such action on the part of the legislature fully satisfied the requirement of the Constitution and was final, and, *second*, because the adoption of the resolution of ratification was not an "act" of the legislature within the scope of the referendum provision of our State Constitution. The validity of proposed legislation was in no way involved.

It is urged on behalf of the defendant that the granting of the writ of mandamus is discretionary and that in the exercise of its discretion this court, if of the opinion that the proposed legislation is unconstitutional, should not require its submission to the electors. It might well be said in answer that the jurisdiction of the court should be determined before considering the question presented. But this court has said in no uncertain terms that it has no discretion when called upon to compel a public officer to perform a duty imposed on him by law.

"A mandamus in a case where the duty of a public officer is absolute and specific * * * is no more matter of discretion than any other remedy." *Auditor General* v. *County Treasurer*, 73 Mich. 28, 32.

This court has no express or implied power by judicial veto to nullify *in futuro* a prospective law foreshadowed by a properly introduced bill before the legislature, nor, by analogy, a proposed amendment of the Constitution properly presented by petition for the electors to pass upon. In our opinion it is neither the duty nor the right of this court in this proceeding

to pass upon the constitutionality of this amendment which has not been, is not now, and never may become a part of our Constitution.

MOORE, C. J., and STEERE, STONE, and BIRD, JJ., concurred with SHARPE, J.

FELLOWS, J. (*dissenting*). I entertain no doubt that the proposed amendment is in conflict with the 14th Amendment to the Constitution of the United States, which provides:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

By this amendment to the Federal Constitution the States of the Union did not surrender their police power; that was still retained by the State; but in my judgment this proposed amendment is beyond the police power thus reserved. While a hard and fast definition of the police power, inclusive and exclusive, has not been generally attempted by the courts, it is universally understood and held that the measure sought to be sustained under the police power must bear some reasonable relation, at least in some degree, to the public good, or the public health, or the public morals, or the public safety, or the public welfare. If it bears no such relation it is beyond such power, and if it abridges the privileges or immunities of the citizen or deprives him of life, liberty or property without due process of law it must fall before the superior mandate of the Federal Constitution whether it be a State statute or a provision of a State Constitution.

While the proposed amendment is very carefully worded to attract votes, it takes from the parents the

privilege of educating their children in parochial or private schools; indeed, it takes from them the right to exercise any control over the education of their own offspring and gives such right to the State. It prohibits the conduct of the business of educating children by private parties, denominations and corporations organized for that purpose under our laws, and takes from them without compensation the right to use for educational purposes property owned by them and devoted to that use admitted to be worth seventy millions of dollars.

Some 120,000 children between the ages of 5 and 16 years are now being educated in the parochial schools of the State. The instructions cover the usual branches taught in the public schools and in addition there is moral training and the doctrine of the Christian religion is inculcated in these youthful minds. That these schools may be regulated by the State is admitted on all hands, but that their existence may be prohibited by State mandate is an entirely different proposition. Before the business of educating the young in the same courses taught by the public schools, before the business of educating the young in the Christian religion, before the business of conducting these parochial schools can be outlawed and prohibited, their prohibition must bear some reasonable relation to the public good, or the public health, or the public morals, or the public safety, or the public welfare. The right to regulate I concede; the right to prohibit I deny. That the right of the State to regulate a business under its police power does not carry with it the right to destroy, the right to prohibit, is illustrated by two cases decided by the court of last resort of the Nation. The first of these cases arose in this State. By Act No. 301, Public Acts 1913, the State regulated the business of conducting an employment agency. Its validity was sustained by this court in *People* v. *Brazee,* 183

Mich. 259. That case was reviewed in the Supreme Court of the United States in *Brazee* v. *Michigan*, 241 U. S. 340 (36 Sup. Ct. 561), and the right of the State to *regulate* the business was upheld. But in the later case of *Adams* v. *Tanner*, 244 U. S. 590 (37 Sup. Ct. 662, L. R. A. 1917F, 1163, Ann. Cas. 1917D, 973), that court had before it a statute of the State of Washington which was so worded as to prohibit the carrying on of the business of an employment agency and the right to *prohibit* such business was denied. I quote the syllabus:

"The business of securing honest work for the unemployed in return for an agreed consideration is a useful and legitimate business which, though subject to regulation under the State police power, cannot be forbidden by an act of a State without violating the guaranty of liberty secured by the 14th Amendment."

Mr. Justice McReynolds, who wrote the prevailing opinion, said:

"Because abuses may, and probably do, grow up in connection with this business, is adequate reason for hedging it about by proper regulations. But this is not enough to justify destruction of one's right to follow a distinctly useful calling in an upright way. Certainly, there is no profession, possibly no business, which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skilfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranties of the Constitution cannot be freely submerged if and whenever some ostensible justification is advanced and the police power invoked."

Chief Justice Baker of the court of last resort of Kentucky so clearly and forcefully demonstrates that such arbitrary power as is here sought to be conferred upon and exercised by the State through this proposed

amendment is beyond the police power reserved in the State that I quote quite liberally from what was said by him speaking for the court in *Columbia Trust Co.* v. *Lincoln Institute,* 138 Ky. 804 (129 S. W. 113, 29 L. R. A. [N. S.] 53), where the right of the State to prohibit the business of conducting a private school was involved and where such right of the State was denied. He said:

"If the teaching of the young to be useful, upright, Christian citizens is not inimical to the public safety, public morals, or the public health, then it must follow that an act whch seeks either to prohibit it altogether, or to authorize others to prohibit it, must be invalid. It is difficult to find language to make plainer that which is so obvious as is the proposition before us. The purposes of the institution under discussion include the whole circle of the solid virtues with which youth may be endowed. Undoubtedly, it is a substantial good to educate the youth of the State; and such is the declared policy of the Constitution. Section 183 provides: 'The general assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State.' It cannot, then, be in any way injurious to the public to aid in forwarding the great educational policy which the people themselves have declared in their fundamental law,—the giving of every young man and woman in the commonwealth a sound education. And when academic education is supplemented by religious training and special instruction in the agricultural and mechanical arts and sciences, it seems to us that it is contrary to the most obvious public policy that an institution which affords such an education should be in any way blocked or impeded. What good reason can be given for prohibiting the exercise of such a charity as that which we have under discussion, unless it can be shown that education, supplemented by religious training, may be in some way an evil to society? Does not the mind of every virtuous and right-thinking person at once admit that the contrary is true? Do we not know that religious educational training has a tendency to make men more industrious, more virtuous and better, gen-

erally, morally and physically? In other words, better, wiser, and more useful citizens. What would be thought of an act which prohibited the farmer from cultivating a piece of land of greater extent than 75 acres, without the permission of his neighbors? By what argument could an act be supported which prohibited a manufacturer from working more than a given number of artisans? And yet it is seriously contended that a school which seeks to make religious, upright, educated citizens may be prevented under the police power of the State as a public nuisance.

"Education strengthens the mind, purifies the heart, and widens the horizon of thought. It magnifies the domain of hope, multiplies the chances of success in life, and opens wide the door of opportunity to the poor as well as to the rich. It makes men better husbands, better fathers, and better citizens."

Should this court by the extraordinary writ of mandamus compel the secretary of State to submit this amendment notwithstanding its invalidity? I think not. Courts do not do idle things and the writ of mandamus is a discretionary writ as the universal holdings of this court demonstrate. Not only must there be a clear legal duty upon the part of the defendant but there must also be a clear legal right in the plaintiff to have that duty discharged. *Auditor General* v. *County Treasurer*, 73 Mich. 28; *Webster* v. *Newell*, 66 Mich. 503; *Taylor* v. *Isabella Circuit Judge*, 209 Mich. 97. Has the plaintiff a clear legal right to have submitted to the electorate of the State an amendment to the State Constitution which is in conflict with the supreme law of the land—the Constitution of the United States? Has he the clear legal right by this discretionary writ to compel the secretary of State to perform certain acts, every one of which is a nullity, with a result that is but "sounding brass and tinkling cymbals?" I think to ask these questions is to answer them. But the question is not without authority in this State. In *Maynard* v. *Board of Can-*

*vassers,* 84 Mich. 228 (11 L. R. A. 332), the plaintiff had under the cumulative voting system provided for by an act of the legislature received more votes than any of the other candidates for the office of member of the legislature. Manifestly the defendant was a ministerial body, not clothed with the judicial power of determining the validity of the act. This court there said, speaking through Chief Justice CHAMPLIN:

"While we adhere to the doctrine laid down in several of our previous decisions, that the duty of a canvassing board is purely ministerial, yet, feeling as we do, that the law is unconstitutional, under which the relator claims to have been elected, we should stultify ourselves to command even a ministerial board to observe it. * * * We have also a precedent from Ohio, where the duty of a canvassing board is ministerial, but who refused a certificate of election to an office claimed to be vacant, but which they deemed not vacant. The supreme court held that although the duties of the canvassing board were ministerial, and they had no right to consider the question of vacancy, yet the court would consider it and not compel the performance of an act that was useless." *State* v. *McGregor,* 44 Ohio St. 628 (10 N. E. 66).

The recent case of *Decher* v. *Secretary of State,* 209 Mich. 565, followed parallel lines with the instant case, and I think in its underlying principle is controlling here upon the question now being considered. In proper form and in sufficient number of signers petitions were filed with the secretary of State asking a referendum to the electorate on the legislative action adopting the 18th Amendment to the Federal Constitution. Upon the advice of the attorney general that such referendum would be invalid under both the Federal and State Constitutions, the secretary of State refused to submit the question to the people. This court not only on the ground that such action was in conflict with the provisions of our own Constitution, but also on the grounds that such action was in con-

flict with the Federal Constitution, refused to compel the secretary of State to submit the question to the electorate. There, as here, the action of the electorate would be a nullity and we did not there postpone saying so. I see no reasonable distinction between that case and this one upon the question now being discussed. I cannot bring myself to feel that this court should by the discretionary writ of mandamus compel the secretary of State to submit this amendment to the people, thus precipitating a bitter religious warfare in this Commonwealth in which neighbor will be arrayed against neighbor, church against church, Protestants against Catholics; yes, Protestants against Protestants, and where the net result can be but a nullity.

The writ should be denied.

BROOKE and CLARK, JJ., concurred with FELLOWS, J.