Marshall, C. J.,
dissenting. I dissent from the majority opinion in this case, because I cannot agree with the majority that the principle declared in the three cases referred to in the brief per curiam opinion is applicable to this controversy, and for the further reason that I believe the majority opinion does not deal even remotely with the principles which should control the judgment of this court.
It should be stated at the outset that the decision of this court should not turn upon moral questions, and the question presented does not concern the merits or demerits of prohibition; we are not concerned with the question whether or not the amendment will prevail if submitted to the electorate, and we are not concerned with the question whether as a matter of policy the officials of the state of Ohio shall take part in the enforcement of the provisions of the 18th Federal Amendment.
We are concerned with the sole question whether or not the relators have a clear legal right to the extraordinary writ of mandamus to compel the secretary of state to discharge a duty imposed by law.
*594 Related to and inseparable from this question is the more direct legal question whether the secretary owes a legal duty to prepare and distribute ballots for the submission of the question of this proposed amendment to the constitution.
These questions must receive the fullest attention,. but before looking to them I desire to first examine the per curiam opinion of the majority.
The per curiam opinion disposes of the case upon the authority of former cases decided by this court in recent years.
I have no desire to detract from the doctrine of stare decisis, neither do I desire to give any expression to the detriment of the value of judicial precedent. My protest' in this ease will be against the application of the authority of former adjudications, because the facts and conditions are essentially different. The three cases referred to are Pfeifer v. Graves, Secy. of State, 88 Ohio St., 473; Weinland v. Fulton, Secy. of State, 99 Ohio St., 10, and City of Cincinnati v. Hillenbrand, 103 Ohio St., 286.
The latter two cases were decided upon the authority of the Pfeifer case, without further discussion of the principles involved, and we should therefore look primarily to the Pfeifer case to ascertain what was decided, and the reasons therefor.
That was an action to enjoin the secretary of state from submitting a law proposed by the initiative to the voters at the election to be held November 4, 1913, and it was claimed (1) that certain preliminary requirements had not been met and (2) that if adopted by the electors of the state it would be unconstitutional.
The courts determined that the preliminary requirements had in fact been met, and upon the ques *595 tion of the invalidity of the law if adopted ruled that such questions could not be determined in advance. Upon this question, it was strongly insisted, on the one hand, that the law would be unconstitutional, and equally urgently insisted, on the other, that it would be valid. The question of its constitutionality was therefore directly raised and became an issue in the controversy.
It is well settled in Ohio, and throughout the Union for that matter, that the courts will not render declaratory judgments; that there must be a real controversy affecting the rights of persons or property, and that the controversy must be carried on by parties who will be affected thereby. Inasmuch as there was a real controversy as to whether or not the legislation would be valid, the court would have been doing violence to the well-settled rule that declaratory judgments will not be rendered had it reached any different conclusion upon that point in the Pfeifer case.
In the case at bar we are not confronted with any such difficulty. A superficial examination of this controversy discloses that there is a clear conflict between the proposed amendment and the provisions of the national prohibition law, known as the Volstead act, and also a clear conflict with the spirit of the 18th Federal Amendment. The argument upon this point is aided by the brief of counsel for relator, because it contains the following clear-cut admission: “This proposed amendment, so long as the Volstead act remains in force, would be ineffectual as a protection to persons prosecuted under that act for dealing in beverages of a higher alcoholic content than one-half of one per cent.” In the oral *596 arguments before the court, counsel were equally frank in reiterating sueh admission.
The national prohibition act (Barnes Fed. Code, Section 8351) contains the following provisions: “The word ‘liquor’ or the phrase ‘intoxicating liquor’ shall be construed to include alcohol, brandy, whisky, rum, gin, beer, ale, porter, and wine and in addition thereto any spirituous, vinous, malt, or fermented liquor, liquids, and compounds, whether medicated, proprietary, patented, or not, and by whatever name called, containing one-half of 1 per centum or more alcohol by volume which are fit for use for beverage purposes.”
In defining offenses it contains the further provision (Barnes Fed. Code, Section 8351b):
“No person shall on or after the date when the eighteenth amendment to the Constitution of the United States goes into effect, manufacture * * * or possess any intoxicating liquor except as authorized in this Act.”
The proposed amendment contains the following:
“No beverage containing two and three-quarters, or less, per cent, of alcohol by weight shall be deemed an intoxicating liquor, and the manufacture and sale of such beverages for consumption in homes and places of abode shall be lawful.”
The Volstead act therefore declares a certain thing to be unlawful, and the proposed amendment to the Ohio Constitution declares the same thing to be lawful.
In the Pfeifer case, there being a clear-cut issue as to the validity of the proposed legislation, the court was justified in refusing to pass upon that branch of the controversy until the question should arise after the adoption of the proposed legislation *597 and when parties were before the court whose personal or property rights were being invaded.
The court in that case would have been clearly wrong if it had clearly appeared and had been freely admitted on both sides that the proposed legislation would have been invalid, and that it was proposed merely to obtain an expression of the voters upon the policy or the wisdom of such proposed legislation. The controversy in that case involved legal questions arising solely under the Ohio Constitution, where the interests of the federal government and other states were not even remotely involved. There was no serious question of transgression of the Federal Constitution, and this fact was particularly made one of the grounds of the court’s conclusion, and was so stated by Judge Wilkin in his opinion. The following is quoted from page 486: “But on the contrary the reserved original power is not to be restricted by any limitations, except such as are imbedded in the federal constitution.” We are quoting only two lines of Judge Wilkin’s opinion, in order to economize space; but if the entire paragraph in which that quotation appears is read it will more clearly appear that the qualifying clause which we have quoted was a necessary qualification to the views expressed by him. It is true that counsel in the Pfeifer case raised a question of violation of the 14th Federal Amendment, but it is well known that this claim is so often urged in cases having no relation whatever to the provisions of that amendment that in most instances such a claim does not compel judicial discussion, but merely provokes a judicial smile. In the Pféifer case it is absolutely certain that the court could not have believed there was a federal question, otherwise the contra of two lines *598 at the end of the opinion, which we have quoted, would have been nonsensical.
In the Pfeifer case there was controversy respecting the paramount authority of the federal constitution and acts of congress. The court in that case used rather sweeping language as to the mandatory character of the initiative provisions of the Ohio constitution, and yet the distinguished judge who wrote the opinion did not fail to have in mind that those provisions could only be mandatory as to legislation in which the state alone was involved.
If it be urged that the language of Judge Wilkin, found in the opinion written by him, does not become the pronouncement of the court without having been incorporated in the syllabus, it may be answered that that expression could not properly have been written into the syllabus because no conflict with the federal constitution and laws was decided. It was entirely proper, however, that the official opinion should sound the warning that a different principle must apply as to limitations which “are imbedded in the federal constitution.”
An examination of proposition 5 of the syllabus in that case shows that reference was made only to conflicts with the state constitution; not to conflicts with the federal constitution.
We have so far discussed only the Pfeifer case, and it is not necessary to enter into any discussion of the case of Cincinnati v. Hillenbrand, supra, because it was decided upon the authority of the Pfeifer case, and the brief per curiam opinion contains no discussion of legal principles, and it must be admitted that the two cases were so exactly parallel that it was proper that it should be decided that they were governed by the same principles; that is *599 to say, in both cases the decision involved purely state policies and laws without any discussion of the ¡federal constitution or federal laws. In both cases there was a real controversy as to whether or not the proposed legislation would be valid.
The writer of this opinion concurred in the per curiam in the Hillenbrcmd case, but it was upon the theory that it was an approval of the syllabus of the Pfeifer case in the light of the opinion of Judge Wilkin and the express reservation therein contained, and certainly not upon any supposition that the limited doctrine therein declared could be extended ad libitum. The concurring opinion filed in this case is in error in stating that the doctrine of the Weinland case was approved in the Hillenbrcmd case. Nowhere in that opinion is any reference made to the Weinland case, and nowhere is there any discussion of conflict with the federal constitution.
The case of Weinland v. Fulton is, however, on a different basis. Although there was no discussion of principles, it was nevertheless decided upon the authority of the Pfeifer case. We have, however, taken the trouble to learn the facts of that controversy, and find that that case did involve a proposal which raised a question of its conflict with the federal constitution, and that question was a live issue in the case. In the light of the decision of Hawke v. Smith, Secy. of State, 100 Ohio St., 385, it is absolutely certain that the members of the court in disposing of the Weinland case believed that the proposal was not in fact in conflict with the federal constitution, the question before the court being whether or not the action of the state legislature in ratifying an amendment to the federal constitution was subject to a referendum upon the filing of a proper *600 petition. The relator in that case (the Weinland case) brought his action in the courts Of Franklin county to enjoin the secretary of state from submitting the proposal to the people, alleging that if adopted it would be a nullity and that therefore the secretary of state was without power to submit it to the electors at the coming election, and that the expense of so doing would be a wasteful expenditure of public funds. We must assume that the members of this court who heard that case upon error and who refused the injunction must have believed that the proposal was valid and not in conflict with the federal constitution, because all the members of this court at that time in office who were still in office when the case of Hawke v. Smith, 100 Ohio St., 385, was heard, concurred in the decision that the amendment which had then been adopted was in fact a valid provision and not in conflict with the federal constitution. The Weinland case therefore was like the Pfeifer case in the respect that there was a real controversy as to the validity of the proposal, and this court therefore determined not to decide that controversy in advance of the adoption of the proposal. The Weinland case, therefore, vitally differs from the instant case, because we now have no controversy as to the validity of the proposal, all parties admitting that it is in conflict with federal law. It is now known that the Weinland case was not correctly decided, because the Hawke case (253 U. S., 221) upon appeal from this court to the supreme court of the United States was reversed and the amendment which this court had approved was declared to be invalid.
*601 The Weinland case is clearly not in harmony with the opinion of Judge Wilkin in the Pfeifer case, because the proposal under discussion in the Weinland case was “restricted by limitations imbedded in the federal constitution.”
The three former decisions of this court referred to have recorded expressions which are much broader than were necessary to a disposition of those cases. In so far as those cases have laid down general propositions extraneous to the facts before the court, they have no effect as binding authorities even upon this court. The rule governing such matters is clearly laid down by Chief Justice John Marshall in Cohens v. Virginia, 6 Wheat., 264, from which opinion, at page 399, we quote: “It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.”
We think the expressions in all of those decisions must be confined to state laws and constitutions, free from questions of federal interference, and free from legislative absurdities, unless this court is willing to sponsor the theory that any proposition, no matter how absurd or how ridiculous or how clearly violative of the federal constitution, must be submitted to the electorate upon a petition being filed with the secretary of state. That is to say, the proposal must be submitted if a petition should be filed proposing an amendment to the Ohio constitution to the effect that people shall no longer grow old, or that *602 the laws of gravitation shall be repealed, or, to be more consonant with reason and good sense, to provide that the state of Ohio shall be empowered to enter into treaties with foreign nations, to coin money, to pass bills of attainder, ex post facto laws, laws impairing the obligation of contracts, granting titles of nobility, denying persons of color the right to vote, and other laws which are clearly forbidden by the federal constitution. Surely no one will seriously contend that any of those propositions should be submitted to the electors. When this question was concretely propounded to counsel for relators during the oral argument, they with commendable frankness admitted inability to answer. IE such proposals could not properly be submitted, then the judgments in the Pfeifer case and in the two cases decided in harmony with it are not applicable authorities and fail to support the majority judgment in the instant case. It should also be kept in mind that all those cases were injunction suits, where the court repeatedly refused to enjoin the threatened action of another coordinate and independent branch of the government, and refused to compel action on the part of executive officers of the government in matters where certain discretion is reposed in such officers.
The instant case is a mandamus suit wherein it is sought to compel action on the part of an executive officer clothed with certain discretionary powers, and the same principle of non-interference which was then established in favor of the officer who was sought to Be enjoined should now be invoked in his favor when action is sought to be compelled.
*603 We must uot forget that the secretary of state has by virtue of his office certain duties to perform and that he has taken a solemn oath to perform them, and that the most important obligation of his oath is that he will support the constitution of the United States. In this case the petition shows that he has refused to act because in his opinion the proposed action would be contrary to the federal constitution and such action would therefore be contrary to his oath of office.
The independence of the coordinate branches of our government and the policy of non-interference with each other imposed the duty upon this court in the three injunction suits not to interfere or to enjoin the threatened action of those cases, except in case of clear right, and the same principle requires that in the instant case action on the part of the secretary of state should not be compelled unless there is also a clear right.
It is a principle well settled, and recognized from time immemorial, that courts will not do a vain thing, neither will they enter any judgment which will command any party to do a vain or purposeless or meaningless act. The controversy in the instant case is between the legislative and executive branches of the government. The executive branch refused to act because he entertained the opinion, the soundness of which no one disputes, that his act would be without effect or result, and would involve the wasteful expenditure of public funds. This court has fairly met and fully affirmed this principle in the case of State, ex rel., v. McGregor, 44 Ohio St., 628. That was a mandamus suit to compel a canvassing board *604 to abstract votes, which they had refused to do on the ground that there was no vacancy in the office. From the opinion, on page 630, we quote: “It may be conceded that it was not the duty of the clerk and the justices, as a canvassing board, to determine that there was no election of sheriff to be held, and to refuse, for such reason, to count and abstract the votes that had been cast for the different persons as sheriff. Nevertheless, as the remedy sought in this action can only be had when the right is clear, if there was no vacancy in the office of sheriff of Stark county to be filled by an election, the writ should be refused, as it is neither the policy nor the practice of courts to require the doing of a vain thing. ’ ’ Surely this court has done a vain thing.
Our attention has been called to the case of Hamilton v. Secretary of State, 212 Mich., 31, 179 N. W. Rep., 553,, which is similar to Weinland v. Fulton, supra, and only differs from the instant case in that there was an issue as to the constitutionality of that proposal, it involving an alleged conflict with the 14th Federal Amendment. While the majority of the Michigan court awarded the mandamus, the dissenting opinion of Justice Fellows is cogent and convincing. It was a five to three decision, and the majority opinion loses its force as an authority when considered in the light of the unanimous opinion of that court rendered only a few months earlier in the case of Decher v. Secretary of State, 209 Mich., 565. In that case it was decided that the secretary of state should not be ordered to submit to the voters a referendum upon the resolution of the Michigan legislature ratifying the 18th Amendment.
*605 On the contrary, the supreme court of Nevada has taken a directly opposite position in the case of State, ex rel. Davies, v. White, 136 Pac. Rep., 110 (36 Nev., 334). The first proposition of the syllabus is as follows: “A writ of mandate will not issue to compel members of a city council to submit to the electors a proposed ordinance which would be void even if approved by a majority of the electors.”
That pronouncement was made under circumstances exactly parallel to those in the case of Cincinnati v. Hillenbrand, supra, and under provisions quite as mandatory upon the election authorities as the provisions of Section la, Article II of the Ohio Constitution. And in the opinion, at page 111, we find the following very emphatic language: “The proposition that a writ of mandate will not issue to compel respondents to submit to the electors of the city a proposed ordinance that would be void even if approved by a majority of the electors is too clear for discussion or the citation of authorities.”
It must not be understood, however, that my dissent is placed upon the authority of the Nevada case, but entirely upon a denial of the applicability of the former Ohio decisions, and other reasons which I will now proceed to discuss.
The conclusions that I have reached upon this subject are based upon the proposition that the framers of the Ohio constitution had no right to incorporate into the state constitution any provisions which could be employed as the instrument of promoting legislation or amending the state constitution upon any subject which would conflict with the federal constitution. For this purpose it is not neces *606 sary to entirely destroy Section la, but to merely hold that it is not applicable to federal questions, just as was declared by Judge Wilkin in his opinion in the Pfeifer case.
We are thus brought directly to the question of paramount sovereignty. This question was evidently before the Philadelphia convention which framed the United States constitution, because in Article VI we lind this language: ‘ ‘ This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.”
It would seem that this language was too clear to admit of further controversy, and yet a number of important decisions of the supreme court of the United States have dealt directly with its interpretation.
The earliest case on this subject is United States v. Fisher, 2 Cranch, 358, decided in 1804. That was a bankruptcy case to determine the priority of a claim of the federal government against, a bankrupt estate under a statute which created such preference. In disposing of the question of supremacy of the federal statute, the court, on page 397, made the following declaration:
‘ ‘ This claim of priority on the part of the United States will, it has been said, interfere with ijhe right of the state sovereignties respecting the dignity of debts, and will defeat the measures they have *607 a right to adopt to secure themselves against delinquencies on the part of their own revenue officers.
“But this is an objection to the constitution itself. The mischief suggested, so far as it can really happen, is the necessary consequence of the supremacy of the laws of the TJhited States on all subjects to which the legislative power of Congress extends.”
The subject next received attention in the case of M’Culloch v. Maryland, 4 Wheat., 316, decided in 1819. That was a ease involving the validity of a state law which levied a tax upon a bank created under a federal statute. It was of course contended that the state law being repugnant to the federal law would be invalid, and upon this point the court, at page 426, made the following observations:
“On this ground the counsel for the bank place its claim to be exempted from the power of a State to tax its operations. There is no express provision for the case, but the claim has been sustained on a principle which so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it, without rendering it into shreds.
‘ ‘ This great principle is, that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them. * * * That where this repugnancy exists, that authority which is supreme must control, not yield to that over which it is supreme.”
The next case was that of Cohens v. Virginia, 6 Wheat., 264, decided in 1821. That case involved a conflict between a federal statute authorizing a *608 lottery company to do business and a statute of 'Virginia making the sale of a lottery ticket within that state an offense. On page 380 of the opinion we find the following: “The American States, as well as the American people, have believed a close and firm Union to be essential to their liberty and to their happiness. They have been taught by experience, that this Union cannot exist without a government for the whole; and they have been taught by the same experience that this government would be a mere shadow, that must disappoint all their hopes, unless invested with large portions of that sovereignty which belongs to independent States. Under the influence of this opinion, and thus instructed by experience, the American people, in the conventions of their respective States, adopted the present constitution.”
In the same opinion, page 389, we find the following: “The people made the constitution, and the people can unmake it. It is the creature of their will, and lives only by their will. But this supreme and irresistible power to make or unmake, resides only in the whole body of the people; not in any subdivision of them. The attempt of any of the parts to exercise it is usurpation, and ought to be repelled by those to whom the people have delegated their power of repelling it.”
After quoting the language of the constitution already herein stated, the court further proceeded (page 381): “This is the authoritative language of the American people; and, if gentlemen please, of the American States. It marks, with lines too strong to be mistaken, the characteristic distinction between the government of the Union, and those of the *609 {States. The general government, though limited as to its objects, is supreme with respect to those objects. This principle is a part of the constitution; and if there be any who deny its necessity, none can deny its authority.”
The next case, and the last of the early cases we will consider, was that of Gibbons v. Ogden, 9 Wheat., 1, decided in 1824. That case involved a question of interstate commerce and arose out of a conflict between a statute of New York, which granted certain exclusive privileges to navigation in the Hudson river, and a federal statute relating to interstate commerce. On page 210 of the opinion we find the following:
“Should this collision exist, it will be immaterial whether those laws were passed in virtue of a concurrent power ‘to regulate commerce with foreign nations and among the several States,’ or, in virtue of a power to regulate their domestic trade and police. In one case and the other, the acts of New York must yield to the law of Congress; and the decision sustaining the privilege they confer, against a right given by a law of the Union, must be erroneous.
“This opinion has been frequently expressed in this court, and is founded as well on the nature of the government as on the words of the constitution.”
In argument counsel for relators dwelt at some length upon the term “concurrent power,” as used in Section 2 of the 18th Amendment of the Constitution of the United States. The claims of counsel as to the meaning to be given to this expression *610 show that they have misconceived the sense in which those words were employed. Counsel evidently believe that the words “concurrent power” were intended to be used in the sense of equal sovereignty. “Concurrent power” should be understood in the sense of power to be exercised at the same time or during the same period. And it would be nothing-short of absurd to conclude that it was intended that congress and the state legislatures should be given power to legislate upon this subject in direct contradiction to each other. It has been pointed out as one of the most praiseworthy features of the federal constitution that it provided a perfect system of checks and balances between the federal government and the governments of the states, and that certain prerogatives were conferred upon the Union and certain other prerogatives were conferred upon the states, with perfect freedom from conflict, and as to those matters where prerogatives were conferred upon the individual states, the state possessed a sovereignty all its own, but as to all those matters where prerogatives were conferred upon the Union there was, as of necessity there must have been, paramount sovereignty in the federal government. While there could be a division of governmental prerogatives, there could not possibly be equality of sovereignty. “Concurrent power” was not a term of unknown meaning when it was incorporated into Section 2 of the 18th Amendment. That term was evidently the subject-matter of discussion from the earliest period of our government and is found in the language heretofore quoted from the case of Gibbons v. Ogden, supra,, where it is clearly stated that federal laws are paramount, whether “passed *611 in virtue of a concurrent power,” or “in virtue of a power to regulate their domestic trade and police.” This is a complete answer to the contentions of counsel for the relator.
The foregoing cases are each and all leading cases, all of them having been decided during the formative period of our history. Each and all of the opinions in those cases were written by Chief Justice John Marshall, and they are particularly valuable as showing how persistent were the intellectual giants of that period in repeatedly bringing forward these questions of disputed sovereignty, and how the supreme court stood as firm as adamant in repeatedly declaring the paramount authority of the federal government.
The foregoing decisions cited and quoted are only a few of the many in which the nationalism of the federal Union has been declared and defined. These are only a few of the cases upon which the immortal fame of John Marshall will forever rest. Many books have been written attesting that fame, and each and all of them rest that fame upon the foundation of his having vitalized the constitution, and having established the new republic as a nation of sovereign people and not merely a confederation of sovereign states. If the present decision shall stand, and possibly be followed by courts of other states, the constructive judicial statesmanship of John Marshall will have become a valueless historical experience.
The paramount authority of the Volstead act in defining the 18th Amendment and in making provision for its enforcement, and the want of power in the states to make laws inconsistent therewith, were *612 under discussion in the National Prohibition Cases, reported in 253 U. S., 350. Seven separate and distinct cases were under review, and the court declared certain principles which are clearly in line with the views already herein expressed. The pertinent ones are quoted as follows:
6. “The first section of the Amendment — the one embodying the prohibition — is operative throughout the entire territorial limits of the United States, binds all legislative bodies, courts, public officers and individuals within those limits, and of its own force invalidates every legislative act — whether by Congress, by a state legislature, or by a territorial assembly — which authorizes or sanctions what the section prohibits.”
7. “The second section of the Amendment — the one declaring ‘The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation’ — does not enable Congress or the several States to defeat or thwart the prohibition, but only to enforce it by appropriate means.”
9. “The power confided to Congress by that section [second section of the amendment], while not exclusive, is territorially coextensive with the prohibition of the first section, embraces manufacture and other intrastate transactions as well as importation, exportation and interstate traffic, and is in no wise dependent on or affected by action or inaction on the part of the several States or any of them.”
The conclusions of the federal supreme court above quoted were announced without any discussion of principles, and it would seem that they are so plain and clear as not to require any discussion, *613 and yet Chief Justice White felt it his duty to enter into a discussion, the following cogent portions of which, to be found on page 391, are quoted:
“I take it that if the second section of the article did not exist no one would gainsay that the first section in and of itself granted the power and imposed the duty upon Congress to legislate to the end that by definition and sanction the Amendment would become fully operative. This being true it would follow, if the contentions under consideration were sustained, that the second section gave the States the power to nullify the first section, since a refusal of a State to define and sanction would again result in no amendment to be enforced in such refusing State.
“Limiting the concurrent power to enforce given by the second section to the purposes which I have attributed to it, that is, to the subjects appropriate to execute the Amendment as defined and sanctioned by Congress, I assume that it will not be denied that the effect of the grant of authority was to confer upon both Congress and the States power to do things which otherwise there would be no right to do. This being true, I submit that no reason exists for saying that a grant of concurrent power to Congress and the States to give effect to, that is, to carry out or enforce, the Amendment as defined and sanctioned by Congress, should be interpreted to deprive Congress of the power to create, by definition and sanction, an enforceable amendment.”
It will be found that his analysis of the subject is in perfect harmony with the conclusions herein declared.
*614 One of the seven cases then under review was that of Feigenspan v. Bodine, 264 Fed. Rep., 186, appealed from the district of New Jersey, in which the judgment of the lower court was affirmed. That case involved the validity of a New Jersey statute which attempted to legalize the manufacture and sale of beer containing 2.75% of alcohol by weight, or 3.4% by volume, being a provision identical with the proposed amendment to the Ohio constitution. The district court of New Jersey reached the conclusion that the New Jersey law was invalid as being in direct conflict with the *Volstead act and announced the following syllabus:
“Eighteenth amendment, §2, providing that ‘the Congress and the several states shall have concurrent power to enforce this article by appropriate legislation,’ must be construed, in harmony with its purpose, to expressly authorize effective legislation for enforcement of section 1, which excludes a construction making concurrence of the states necessary to the effectiveness of congressional legislation, and such legislation, if enacted, is paramount, and, while it may be supplemented by state legislation, it cannot be defeated by any action or nonaetion of the states. In the absence of action by Congress, any state may enact enforcement legislation effective within its borders.”
That decision having been affirmed without further discussion it must be assumed that the supreme court approved of that pronouncement.
In the light of all the foregoing expressions of the supreme court of the United States, it would seem that the invalidity of the proposed Ohio amendment is sufficiently shown.
*615 Another recent ease is that of Hawke v. Smith, Secy. of State, 253 U. S., 221, which will he found to be in nearly all respects parallel to the present controversy.
After the 18th Amendment had been ratified by the Ohio legislature, a petition was filed with the secretary of state for a referendum upon the action of the legislature, under authority of a provision in the Ohio constitution, adopted November 5, 1918, which specially provided for such a referendum. The petition was in every respect regular and sufficient in form. The Ohio constitution on that subject was a part of Section 1, Article II, and was couched in mandatory language, and in that respect in no wise differed from the language of Section la.
It necessarily follows that the judgment should be the same in the instant case as was rendered in the Hawke case. In each case there was a petition in due form and in full compliance with the constitution and it was sought to control the action of the secretary of state in the matter of a submission to the electors of the state. In each ease the question is presented of the validity of the respective provisions of the Ohio constitution, and whether its provisions enjoin action upon the secretary of state after refusal upon his part.
The supreme court of the United States held in the Hawke case that the supreme court of Ohio erred in holding that it had authority to require the submission of the ratification to a referendum under the state constitution, and the judgment of this court was therefore reversed. Following that judgment to its logical conclusion, the judgment of the Ohio supreme court should have been to the eon *616 trary, and therefore the injunction which was denied should have been awarded, in which event the question of the referendum would not have been submitted to the voters at that election. Following the same procedure, and applying the same principles, even though Section la is mandatory in form, and even though the petitions are sufficient, Section la, being subservient to the 18th Amendment and the Volstead act, imposes no legal duty upon the secretary of state, and the mandamus to compel him to submit the proposition should have been denied.
The foregoing authorities have dealt with the question of conflict between state statutes and the federal constitution and federal laws, and, inasmuch as the present controversy relates to a proposed constitutional amendment, it should be shown that no distinction has ever been made between constitutions and laws of the states in this respect. Clause 2 of Article VI of the Federal Constitution reads, “any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.”
This subject received early consideration in the case of Cohens v. Virginia, supra, from which, at page 414, we quote: ‘ ‘ The constitution and laws of a State, so far as they are repugnant to the constitution and laws of the United States, are absolutely void.”
It has received still more direct attention with the same results in the following cases: Dodge v. Woolsey, 59 U. S., 331, and Shelby County v. Union & Planters’ Bank, 161 U. S., 149, 158.
It is a rule which has long been recognized by the federal courts that in construing and applying the statutes of a state that construction and application which has been made by the courts of that state *617 shall be followed by the federal courts. It is an equally well-settled rule that in construing and applying federal laws and the federal constitution, every state should follow that construction and application which has been made by the federal courts. The present controversy being one which involves the 18th Amendment and the Volstead act, this court should defer to the federal decisions already cited and quoted herein. This case should never have been heard and decided by a state court. State courts should not have the last word in pronouncing judgment in cases where the supremacy of the federal constitution and the laws of congress is the issue.
Another principle which should have controlling force in this case is that the secretary of state in refusing to submit this proposal entertained the belief that it was in violation of the 18th Amendment and the 'Volstead act, and surely it must be admitted by everyone that if adopted it would be in conflict therewith, and the writ of mandamus should therefore not be awarded where it will require an officer to do that the effect of which would be unlawful.
There is a long line of cases to the effect that an executive officer may defend in a mandamus proceeding on the ground of the unconstitutionality of the act under which he is called upon to proceed, or on the ground that acting under such statute he would commit a violation of the federal constitution. It is not proposed to enter into a discussion of these authorities but a few of them should be cited: Commonwealth v. Mathues, 210 Pa., 372; Van Horn v. State, ex rel., 46 Neb., 62; State, ex rel., v. Candlmd, 36 Utah, 406; Hodges v. Dawdy, 104 Ark., 583 , State, ex rel., v. Tappan, 29 Wis., 664; Huntington v. *618 Worthen, 120 U. S., 97, and Rhea v. Newman, 153 Ky., 604.
The claims of counsel for relator are based principally upon Section 2 of the 18th Amendment of the U. S. Constitution, which reads: “The Congress and the several States shall have concurrent power io enforce this article by appropriate legislation.” Several of the federal cases already cited particularly point out that any legislation in harmony with this amendment must be along the lines of enforcement and not with a view of thwarting prohibition. If there is any doubt as to the real purpose of the proponents of this resolution, that doubt is removed by an admission made in relator’s briefs as follows: “But the amendment would still have force and effect in governing state prosecutions and the conduct of state officials connected therewith and would prescribe the measure of state activity in the enforcement of the Eighteenth Amendment of the federal constitution.” This admission leaves no room for doubt that the real purpose of this proposal is to thwart the enforcement of the 18th Amendment and to withdraw the aid of the state of Ohio from the federal officials and leave enforcement solely to the activities of the federal authorities.
The effect of the majority opinion in this case is well expressed in the language of the dissenting opinion written by Judge Robinson in the case of Hawke v. Smith, 100 Ohio St., 385, 399, from which we quote: “In my opinion the judgment here elevates state above nation, devitalizes the federal constitution, makes it subject to as many interpretations as there are states, and destroys its uniform operation throughout the nation.”
*619 The concurring opinion of Judge Wanamaker deals at great length with the subject of judicial interference with the legislative branch. It is of course a serious thing for any of the three branches of the government to interfere with any of the other branches. Inasmuch as each of the branches was intended as a check upon both the other branches it is inevitable that such check should cause a crossing of paths, but, so long as the check is lawfully exercised, there is no unlawful interference.
The concurring opinion characterizes the dissenting opinion as standing for the interference by the judiciary with legislative processes. This characterization is not warranted. In the instant case 10% of the electors desire to invoke legislative action upon a subject which an executive branch of the government, to-wit, the secretary of state, conceives to be forbidden by federal statutes.
The secretary of state very properly, as it seems to me, refuses to employ the election machinery, together with large sums of money raised by taxation, for such purpose. If unlawful interference between the different branches of the government exists anywhere it consists in the award by this court of the extraordinary writ of mandamus against the executive branch of the government to compel the secretary of state to do that which his judgment and his conscience tell him it is unlawful for him to do.
The issue in this case is whether this court shall be loyal to the supreme law of the land, the American constitution, as interpreted by the numerous early decisions of the United States supreme court. It is not a question, as intimated in the concurring opinion, whether the people shall be denied the right *620 to vote upon a proposed amendment of the Ohio constitution, but the question is whether 10% of the voters, or the whole number of the voters, have the power to write into the state constitution a provision, which, if written into the constitutions of all the states, would completely annul the supreme law of the land. If the Pfeifer case means what Judge Wilkin says it did not, and what the concurring opinion in this case says it did, then the principle declared in the Pfeifer case was clearly overthrown by the decision of the supreme court of the United States in Hawke v. Smith, supra.
It was stated at the outset of this opinion that we are not concerned with the moral questions un derlying this controversy, nor are we concerned with questions of local policies. It should be stated in conclusion that there is a fundamental governmental question involved which is more vital and deep-seated than any of the legal questions which have heretofore been discussed. In referring to it as a governmental question, it must not be understood that it is not also a legal question. Beginning with the debates over the ratification of the federal constitution and continuing for two or three decades thereafter there was a bitter controversy as to where paramount sovereignty should rest. That question was definitely settled as a legal question by a long line of uniform decisions of the supreme court of the United States, and, later, as a governmental question, by the arbitrament of war. Some of those cases have been referred to in this opinion, but a brief review of some of the history of the governmental controversies will not be foreign to this discussion.
*621 The “Kentucky Resolutions” which were adopted hy the Kentucky legislature November 14, 1798, declared the alien and sedition laws passed by congress a few months previously to be null and void, and declared principles of state sovereignty wholly inconsistent with federal nationalism. They declared that the federal government was not the exclusive or final judge of the extent of the powers delegated to it. Immediately thereafter similar resolutions were prepared and adopted by the ‘Virginia legislature on December 21, 1798. These were known as the “Virginia Resolutions.” They went even to the extent of appealing to the other states of the Union to cooperate in “maintaining unimpaired the authorities, rights and liberties reserved to the states and to the people.”
These early assertions of the right of a state to annul and overthrow a national law were the first plantings of the seeds of the philosophy of secession and nullification, and from that beginning, fed by the dissatisfaction of every cult and enterprise not in harmony with the majority, or the party in power, the doctrine grew and developed until it finally culminated in Appomatox.
The early action of those states was actuated by the belief that the sedition laws were an invasion of the “personal liberty” of free speech, just as the proponents of the proposed amendment of the Ohio constitution profess to believe that their personal liberties are being infringed. The other states of the Union declined to respond to the appeal of Virginia, and answered that the ultimate arbiter of constitutionality was the supreme court of the United States, and that the legislative method of relief was *622 by amendment of tbe federal constitution in the manner prescribed by that instrument. Not many years thereafter the case of Marbury v. Madison, 1 Cranch (5 U. S.), 137, settled once for all the proposition that the supreme court of the United States is the final arbiter o'f the acts of congress.
The Hartford Convention, which met December 15, 1814, composed of delegates of New England states, on account of dissatisfaction with the governmental policies growing out of the war of 1812, and which sat behind closed doors, declared “that it was tbe right and duty of a state to exert its authority to protect its citizens from unconstitutional acts of the general government.”
In argument counsel referred to the South Carolina Convention of 1832, the last public convocation prior to the civil war, wherein nullification received affirmative action. That was a convention of the people of South Carolina, provision for which was made at a special session of the legislature.
It ordained that the tariffs of 1828 and 1832 were null and void, and should cease to be operative in the state after February 1, 1833. It enjoined upon the legislature, to pass the acts necessary to enforce the ordinance, and required all state officers, civil and military, to take oath to enforce it.
The deadly parallel between all these ordinances and resolutions and the proposed amendment to the Ohio constitution is too self-evident to require further elaboration.
A prelude to the South Carolina convention was Webster’s famous “Reply to Hayne,” delivered in the senate January 26, 1830, in which he declared that there could be no middle course between submission to laws regularly pronounced constitutional *623 and revolution or rebellion; that if each state had the right of final judgment on questions in which she is interested “the Union is a rope of sand.”
During the formative period of our history many of the leading statesmen firmly and sincerely believed in the doctrine of paramount state sovereignty and that a state could not lawfully be coerced. This doctrine was so often asserted and advocated with' such force that it is not strange that it encouraged the slave holding states to put it to the supreme test. It was finally settled at an enormous cost of blood and treasure, and for more than a half century not a single incident of our history has even suggested anything other than the paramount sovereignty of the Union.
If each and all the states will respect the ‘Volstead act and compel obedience to and enforcement of its provisions, harmony and uniformity will result; but if each state is permitted to establish different definitions, the 18th Amendment becomes discordant and contemptuous both in letter and spirit— a condition which fulfills the avowed purpose of this proposed legislation.
The effect of this proposal would be to prohibit the punishment by state authorities of violations where the alcoholic content was less than 2.75%, and therefore the direct and inevitable trend and tendency of the proposal is toward nullification, because nullification of enforcement is incipient anarchy and a thousandfold more dangerous than nullification of the law itself.
The substance of the contention made by counsel for relator in this case and by the majority opinion is to the effect that the people of Ohio are supreme within the jurisdiction of the state and that they can *624 therefore write what they please in their state constitution. It is for this reason that we have gone at some length into an examination of the pages of our early history to show that such an attitude breathes a spirit of defiance to federal sovereignty. It would be a more correct statement to say that the people of Ohio may write what they please in their slate constitution so long as it does not transgress the basic law of the Union. If there is to be no exception and no limitation upon the right of the people of any state to write into their constitutions declarations of principles, no matter how violative of the sound well-settled principles of democratic government, and no matter how contrary to the fundamental principles laid down in- the federal constitution, as expounded by Webster, and as interpreted by John Marshall and his associates, then it is conceivable that in the course of time the constitutions of the several states will become filled with complaints and criticisms of the federal constitution and the amendments thereto. It is needless to add that it would be a most dangerous situation if such doctrines should be written into the constitutions of the several states, thereby sowing the seeds of dissension and anarchy and lending aid to those of bolshevistic and communistic tendencies in spreading their subversive doctrines.