PROTECT MI CONSTITUTION v SECRETARY OF STATE

Docket No. 311504. Submitted August 6, 2012, at Lansing. Decided August 14, 2012, at 9:00 a.m. Reversed and mandamus order vacated, 492 Mich 860.

Protect MI Constitution (PMC) filed an original action in the Court of Appeals against the Secretary of State, seeking a writ of mandamus to direct the Secretary to reject a ballot question petition for a constitutional amendment filed by intervening defendant, Citizens for More Michigan Jobs (CFMMJ). CFMMJ, a ballot question committee, collected signatures for a constitutional amendment proposal to be placed on the November 2012 general election ballot. The CFMMJ proposal would have amended Const 1963, art 4, § 41 to expand casino gaming in the state by allowing a fourth casino in Detroit and seven other casinos at specific locations, as well as addressing subjects related to gaming that are governed presently by the Michigan Gaming Control and Revenue Act MCL 432.201 *et seq.*, a 1996 voter-initiated law. PMC claimed that the proposal would amend the gaming act without following the constitutional procedures necessary to amend a voter-initiated law, without following the constitutional procedures requiring a title and republication of the statute to alter, revise, or amend an existing law and that the petition would impermissibly advance more than one purpose, which was incapable of expression in 100 or fewer words.

The Court of Appeals *held*:

1. The Court of Appeals has jurisdiction over an original action for mandamus against a state officer, such as the Secretary of State. A writ of mandamus is an extraordinary remedy but it is the appropriate remedy for a party seeking to compel action by election officials. The plaintiff seeking mandamus must show that (1) the plaintiff has a clear legal right to the performance of the duty sought to be compelled, (2) the defendant has a clear legal duty to perform the requested act, (3) the act is ministerial, and (4) no other remedy exists that might achieve the same result. The Court of Appeals has jurisdiction to issue a writ of mandamus against the Secretary of State in this ballot question petition.

2. Election cases are of a special nature and ordinary citizens have standing to enforce the law in such cases. In the absence of a statute to the contrary, a private person may enforce by mandamus a public right or duty relating to elections without showing a special interest distinct from the public's interest. The general interest of ordinary citizens to enforce the law in election cases is sufficient to confer standing to seek mandamus relief. PMC had standing to bring this mandamus action against the Secretary of State to prevent inclusion of the proposed constitutional amendment on the November 2012 ballot.

3. A ballot issue controversy is ripe for review when it is not dependent on the Board of State Canvassers' counting or consideration of the petitions but involves a threshold determination whether the petitions on their face meet the constitutional prerequisites for acceptance. The case was ripe for review because the constitutional issue was limited to the procedure employed by CFMMJ to alter the gaming act by means of a constitutional amendment, and the proposal's eligibility for the ballot; the case was not dependent on the Board of State Canvassers' counting or consideration of the petitions.

4. In an action for mandamus involving an election ballot, the Court of Appeals must examine the constitutional amendment initiative to determine its eligibility for the ballot in light of constitutional prerequisites for acceptance. An act is ministerial if it is prescribed and defined by law with such precision and certainty as to leave nothing to the exercise of discretion or judgment. The Secretary of State's decision to reject or accept the CFMMJ petition would be ministerial, and thus subject to a mandamus order, after the Court of Appeals determined whether the CFMMJ petition would satisfy the constitutional requirements for placement on the general election ballot because such a decision would not require the exercise of judgment or discretion.

5. Const 1963, art 12, § 2 allows voters to amend the constitution by voter initiative, while under Const 1963, art 2, § 9, an initiated law may be amended or repealed by a vote of the electors unless otherwise provided in the initiative measure or by three-fourths of the members elected to and serving in each house of the Legislature. To provide notice to the public of the full effects of a proposed amendment, Const 1963, art 4, § 25 requires that no law, including the revision or the alteration of an initiative law, shall be revised, altered or amended by reference to its title only; the section or sections of the act altered or amended must be reenacted and published at length. Because the gaming act does not provide

another means for its amendment, a vote of the electorate or a three-fourths vote in each house of the Legislature is required for its amendment. The CFMMJ proposed constitutional amendment may not be placed on the November election ballot because the CFMMJ petition failed to notify the public by publishing at length the sections of the voter-initiated gaming act that the proposed constitutional amendment would alter as required by Const 1963, art 4, § 25.

Writ of mandamus issued and the Secretary of State ordered to reject CFMMJ's petition and disallow it from the ballot.

RONAYNE KRAUSE, J., concurring in part and dissenting in part, did not take issue with the majority's position that the CFMMJ petition did not conform to the requirements of the Michigan Constitution and agreed that the Secretary of State has a clear legal duty to evaluate ballot proposals for such compliance. Judge RONAYNE KRAUSE concurred with the majority to the extent that the writ of mandamus directed the Secretary to perform this duty, but dissented to the extent that the majority determined that it had authority to issue a writ of mandamus directing the Secretary of State's ultimate decision by ordering it to reject the CFMMJ petition. She would have concluded that while the Secretary of State had a clear legal duty to evaluate the ballot initiative for facial compliance with the technical formalities dictated by the Constitution, it was that decision that would then be reviewable by the Court of Appeals, as would an appeal from an action seeking declaratory relief if one or more of the parties had sought such relief.

*Dickinson Wright, PLLC* (by *Peter H. Ellsworth* and *Jeffrey V. Stuckey*), and *Honigman Miller Schwartz and Cohn, LLP* (by *John D. Pirich* and *Andrea L. Hansen*), for Protect MI Constitution.

*B. Eric Restuccia*, Deputy Solicitor General, and *Jeanmarie Miller*, *Denise C. Barton*, and *Nicole A. Grimm*, Assistant Attorneys General, for the Secretary of State.

*Fraser Trebilcock Davis & Dunlap, P.C.* (by *Jonathan E. Raven* and *Graham K. Crabtree*), for Citizens for More Michigan Jobs.

Amicus Curiae:

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Counsel, and *Laura L. Moody* and *Mark G. Sands*, Assistant Attorneys General, for the Attorney General.

Before: OWENS, P.J., and O'CONNELL and RONAYNE KRAUSE, JJ.

O'CONNELL, J. In this original action, plaintiff, Protect MI Constitution (PMC), seeks a writ of mandamus against defendant Secretary of State (the Secretary). PMC asks this Court to direct the Secretary to reject a ballot question petition for a constitutional amendment filed by intervening defendant Citizens for More Michigan Jobs (CFMMJ). We grant the requested relief.

I. INTRODUCTION

CFMMJ is a ballot question committee that collected more than 500,000 petition signatures for a constitutional amendment proposal to be placed on the November 2012 general election ballot. The CFMMJ proposal would amend art 4, § 41 of the Michigan Constitution and expand casino gaming throughout the state. The proposal would allow a fourth casino in Detroit and seven other casinos at specific locations. Additionally, the CFMMJ proposal addresses subjects related to casino gaming that are presently governed by the Michigan Gaming Control and Revenue Act (the Gaming Act), MCL 432.201 *et seq.*, which was enacted by voter initiative in 1996. In some respects, the CFMMJ proposal directly contradicts provisions of the Gaming Act, and CFMMJ admits that its proposal would limit, suspend, or invalidate portions of the Gaming Act.

PMC is a ballot question committee, representing existing casinos, that was formed to oppose the CFMMJ proposal and challenge its eligibility for the ballot. PMC claims that the proposal would amend the Gaming Act without following the constitutional procedures in Const 1963, art 2, § 9 for amending a voter-initiated law, or the constitutional procedures in Const 1963, art 4, §§ 24 and 25, requiring a title and republication of the statute to alter, revise, or amend an existing law. PMC also asserts that the CFMMJ petition impermissibly advances more than one purpose, and that its purpose is incapable of expression in 100 or fewer words.

PMC seeks a writ of mandamus from this Court directing the Secretary to stop the canvass and to refrain from taking any action to place the CFMMJ proposal on the ballot. The Attorney General has filed an amicus brief supporting PMC's position.[1]

This case presents an issue of first impression. We are asked to examine the process that the constitution requires for placing before the voters a proposed constitutional amendment that would alter specific provisions of a voter-initiated law. Our constitution sets forth separate and distinct procedures for amending the constitution, amending a voter-initiated law, and revising or altering a law. Michigan case law has not addressed whether the constitutional requirements for altering or amending a voter-initiated law must be satisfied when a petition for a constitutional amendment proposes a change in that law. We hold that Const 1963, art 4, § 25, which provides that a law may not be

---

[1] We granted the motion of the Attorney General to file an amicus curiae brief. *Protect MI Constitution v Secretary of State*, unpublished order of the Court of Appeals, entered August 3, 2012 (Docket No. 311504).

altered, revised, or amended without a republishing of the affected statutory language, applies to the CFMMJ petition presently before us. We further hold that the CFMMJ petition fails to comply with the prerequisites of article 4, § 25. Accordingly, the Secretary has a clear legal duty to reject the petition.

II. BACKGROUND AND PROCEDURAL HISTORY

A. THE GAMING ACT AND CONST 1963, ART 4, § 41

In the November 1996 general election, Michigan voters approved ballot initiative "Proposal E," which allowed the establishment of three casinos in Detroit. Proposal E created the Michigan Gaming Control Board to regulate casino operations and imposed an 18% state wagering tax on gaming revenues. Of this tax revenue, 55% was allocated to Detroit for public safety and economic development, and 45% was allocated to the state for public education. The law became effective December 5, 1996.[2] The Legislature codified Proposal E in the Gaming Act and subsequently amended the law in 1997 by a three-fourths vote of both houses of the state legislature, as provided by Const 1963, art 2, § 9 to amend a voter-initiated law.[3]

---

[2] Const 1963, art 2, § 9 provides that an initiated law becomes effective ten days after the official declaration of the vote.

[3] 1997 PA 69 defined the term "city" as a

local unit of government other than a county which meets all of the following criteria:

(*i*) has a population of at least 800,000 at the time a license is issued.

(*ii*) is located within 100 miles of any other state or country in which gaming was permitted on December 5, 1996.

(*iii*) had a majority of voters who expressed approval of casino gaming in the city. [MCL 432.202(*l*).]

In 2004, Michigan voters adopted a constitutional amendment to restrict the expansion of legalized gaming by requiring voter approval for certain expansions. Article 4, § 41 of the Constitution presently provides:

> The legislature may authorize lotteries and permit the sale of lottery tickets in the manner provided by law. No law enacted after January 1, 2004, that authorizes any form of gambling shall be effective, nor after January 1, 2004, shall any new state lottery games utilizing table games or player operated mechanical or electronic devices be established, without the approval of a majority of electors voting in a statewide general election and a majority of electors voting in the township or city where gambling will take place. This section shall not apply to gambling in up to three casinos in the City of Detroit or to Indian tribal gaming. [Const 1963, art 4, § 41.]

### B. THE CFMMJ BALLOT PROPOSAL

The CFMMJ proposal would amend Const 1963, art 4, § 41. The proposed constitutional amendment would strike all of the existing language of § 41 *except* the first sentence, "The Legislature may authorize lotteries and permit the sale of lottery tickets in any manner provided by law." The CFMMJ proposal[4] would add language to § 41 to allow casino gaming in eight locations in the state, providing in part:

> The Legislature may authorize lotteries and permit the sale of lottery tickets in any manner provided by law. In addition, for the purpose of Michigan employment opportunities and economic development, as well as funding for K-12 schools, police and fire services, and road construction and repair, casino gaming shall be permitted in the following locations throughout the State of Michigan:

---

[4] The CFMMJ proposal is written in all capital letters in the petition. However, for ease of reading it is reproduced in this opinion in lower case letters.

In the City of Detroit, in addition to the three existing
Casinos in that city, on [certain designated properties].

The proposed amendment provides the legal descriptions
of parcels for the potential location of a new Detroit
casino. It also authorizes seven new casinos outside De-
troit and provides the legal descriptions of sites in Clam
Lake Township in Wexford County, DeWitt Township in
Clinton County, Pontiac in Oakland County, Clinton
Township in Macomb County, Birch Run Township in
Saginaw County, Grand Rapids in Kent County, and
Romulus in Wayne County.

The Gaming Act allows only three casinos in Detroit.
MCL 432.206(3). In addition to authorizing new casi-
nos, the CFMMJ proposal contains several provisions
that are different from, and in some places directly
contrary to, various provisions in the Gaming Act. For
example:

(1) The Gaming Act defines "casino" as "a building in
which gaming is conducted." It defines "gaming" as "to
deal, operate, carry on, conduct, maintain or expose or
offer for play any gambling game or gambling opera-
tion." MCL 432.202(g) and (x).

The CFMMJ proposal uses the term "casino gaming,"
which it defines as "gambling in each and all forms now
and hereafter authorized within the state of Michigan and
by federal law. The term 'casino' means the facility in
which actual gaming activities are conducted."

(2) The Gaming Act imposes an 18% wagering tax on
the adjusted gross receipts from casinos. MCL
432.212(1).

The CFMMJ proposal would impose a 23% wagering
tax on the casinos' adjusted gross receipts.

(3) The Gaming Act allows a city to impose a munici-
pal services fee on the casino operator (licensee) that is

"equal to the greater of 1.25% of adjusted gross receipts or $4,000,000.00 in order to assist the city in defraying the cost of hosting casinos." MCL 432.213(1).

The CFMMJ proposal would eliminate the ability of cities to impose municipal services fees and other assessments related to gaming. The language of the proposed amendment to Const 1963, art 4, § 41 includes:

> No other taxes, fees, assessments or costs of any kind related directly to gaming or wagering shall be imposed upon a casino subject to the wagering tax described in this section, except for reasonable regulatory fees imposed by the State of Michigan for a license to operate the casino or for fines and penalties assessed by the State of Michigan for conduct prohibited by Michigan law.

(4) The Gaming Act allocates 55% of the wagering tax revenues to specified uses within the city where a casino is located and 45% of the wagering tax revenues to fund state public education. MCL 432.212(3).

The CFMMJ proposal would reallocate the wagering tax revenues. The taxes from Detroit casinos would be allocated as follows: 60% of the wagering tax revenues would fund police and fire services in Detroit, 20% would fund K-12 schools throughout the state, and 20% would fund road repairs and construction throughout the state. For wagering tax revenues generated by casinos outside Detroit, 30% of the revenues would be distributed to the state to fund K-12 public schools, 20% of the revenues would be distributed directly to all municipalities throughout the state to fund police and fire services, 20% would be distributed directly to the municipality where the casino is located, 20% to the county where the casino is located, 5% to the state to fund road repair and construction, and 5% to the state to fund gambling-addiction programs.

(5) The Gaming Act requires casinos to pay for all the state's "regulatory and enforcement costs, compulsive gambling programs, casino-related programs and activities, casino-related legal services provided by the attorney general, and the casino-related expenses of the department of state police." MCL 432.212a(1).

As stated, the CFMMJ proposal would prohibit other taxes, fees, assessments or costs of any kind related directly to gaming or wagering from being imposed on a casino, "except for reasonable regulatory fees imposed by the State of Michigan for a license to operate the casino" and fines or penalties for wrongful conduct.

(6) The Gaming Act governs the application procedure for casino licenses. It requires certain disclosures, criminal background and financial information, and other information that must be provided to (and reviewed and investigated by) the Gaming Control Board. MCL 432.205; MCL 432.206.

The CFMMJ would authorize the Gaming Control Board to establish rules for casino licensing. The proposed amendment does not require disclosure of investors or background checks of employees.

(7) The Gaming Act provides that "[a]lcoholic beverages shall only be sold or distributed in a casino pursuant to the Michigan liquor control act." MCL 432.210.

The CFMMJ proposal entitles all casinos to liquor licenses: "All of the casinos authorized by this section shall be granted liquor licenses issued by the State of Michigan to serve alcoholic beverages on the premises."

(8) As a condition for eligibility to apply for a casino license, the Gaming Act requires an applicant to have "entered into a certified development agreement with the city where the local legislative body enacted an ordinance approving casino gaming." MCL 432.206(1)(b). Applicants

must submit the required development agreements and documents with their applications. MCL 432.205(3).

The CFMMJ proposal does not require development agreements. To the extent that such agreements would impose fees or assessments by the city related to gaming, they would be prohibited.

### C. PMC'S REQUEST TO THE SECRETARY TO REJECT THE CFMMJ PETITION

CFMMJ submitted its petition on June 26, 2012, to the Secretary for placement on the November ballot. In a July 17, 2012, letter to the Secretary, counsel for PMC urged the Secretary to determine that the CFMMJ proposal is ineligible for the ballot. PMC advanced three reasons in support of its position: (1) a single ballot proposal may not be used to amend both the constitution and an initiated law; (2) a ballot proposal that would amend an initiated law must comply with Const 1963, art 2, § 9; and (3) because the CFMMJ ballot proposal would amend the Gaming Act, the petition must have a title stating that objective and inform voters of the proposal's effect on the initiated law by republishing the Gaming Act, in accordance with Const 1963, art 4, §§ 24 and 25.

The Director of Elections responded that no clear legal duty exists on the part of the Secretary "to decide whether a ballot question is constitutional." The Secretary notified the Board of State Canvassers of the filing of the CFMMJ petition, and the Board began its canvass of the petition to determine the validity and sufficiency of the petition signatures pursuant to Const 1963, art 12, § 2.[5]

---

[5] MCL 168.477(1) requires the Board to certify the petition as sufficient or insufficient at least two months before the general election, which in this case is September 7, 2012. When PMC filed its complaint for

### III. THE COMPLAINT FOR MANDAMUS

PMC asks this Court to direct the Secretary to reject the petition. PMC claims that although the CFMMJ petition purports only to amend article 4, § 41 of the state constitution, the proposal also amends several provisions of the voter-initiated Gaming Act without complying with the constitutional procedures in art 2, § 9 for doing so. Additionally, the petition is silent about the proposed constitutional amendment's effects on the Gaming Act. PMC contends that the proposal is ineligible for the ballot because the CFMMJ petition does not comply with the title and notice requirements of Const 1963, art 4, §§ 24 and 25 for altering, revising, or amending a law. PMC characterizes the CFMMJ proposal as an attempt to surreptitiously amend the Gaming Act by constitutional amendment, thereby circumventing the constitutional requirements for altering or amending a statute.

The Secretary answers that she has no legal duty to review the CFMMJ petition to determine whether it meets the constitutional prerequisites for acceptance and placement on the ballot. The Secretary maintains that determining the procedural constitutionality of the CFMMJ petition is a discretionary task that is outside the scope of her statutory responsibilities and authority. She also states that any such duty, if it exists, would not be ministerial in nature and therefore would not be a proper subject for mandamus relief.[6]

---

mandamus, the CFMMJ petition was before the Board of State Canvassers, and the Board's decision regarding the sufficiency of the petition was pending.

[6] The Secretary takes no position regarding the merits of PMC's allegations regarding the constitutional validity of the CFMMJ proposal, but she recognizes her ministerial duty to act in accordance with this Court's determination whether the proposal meets the constitutional prerequisites for acceptance.

CFMMJ intervened.[7] CFMMJ challenges PMC's standing to bring this mandamus action and the ripeness of this case for decision. With respect to the merits of the complaint, CFMMJ argues that its proposal seeks only to amend the constitution, and that CFMMJ has complied with the requirements of Const 1963, art 12, § 2 for doing so. CFMMJ concedes that the proposed constitutional amendment will limit or suspend some provisions of the Gaming Act and will impact the application and the enforcement of the Gaming Act. But CFMMJ maintains that the proposed constitutional amendment will not amend the Gaming Act in any way because the language of the Gaming Act will remain unchanged. CFMMJ argues that the procedural requirements for amending a statute are inapplicable because its proposal seeks to amend the constitution.

The Attorney General urges this Court to grant mandamus relief and to order the Secretary to refrain from placing the CFMMJ proposal on the ballot. The Attorney General maintains that a single ballot proposal cannot be used to amend both a voter-initiated law and the constitution. The Attorney General argues that CFMMJ's compliance only with Const 1963, art 12, § 2 regarding publication of the constitutional provision that would be changed by the proposed constitutional amendment leaves voters uninformed about the effect that the proposal would have on the voter-initiated Gaming Act. The Attorney General argues that alteration or revision of the Gaming Act, which the CFMMJ proposal would affect, requires a title and publication of the affected provisions under Const 1963, art 4, §§ 24 and 25.

---

[7] We granted CFMMJ's motion to intervene. *Protect MI Constitution v Secretary of State*, unpublished order of the Court of Appeals, entered August 2, 2012 (Docket No. 311504).

IV. DISCUSSION AND ANALYSIS

A. JURISDICTION

This Court has jurisdiction over an original action for mandamus against a state officer. MCR 7.203(C)(2); MCL 600.4401(1). The Secretary is a state officer for purposes of mandamus. *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 282; 761 NW2d 210, aff'd in part 482 Mich 960 (2008). "Mandamus is the appropriate remedy for a party seeking to compel action by election officials." *Id.* at 283.

B. STANDARD FOR MANDAMUS

A writ of mandamus is an extraordinary remedy. *Coalition for a Safer Detroit v Detroit City Clerk*, 295 Mich App 362, 366; 820 NW2d 208 (2012). The plaintiff must show that (1) the plaintiff has a clear legal right to the performance of the duty sought to be compelled, (2) the defendant has a clear legal duty to perform the requested act, (3) the act is ministerial, and (4) no other remedy exists that might achieve the same result. *Id.* at 366-367. See also *White-Bey v Dep't of Corrections*, 239 Mich App 221, 223-224; 608 NW2d 833 (1999). An act is ministerial if it is "prescribed and defined by law with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Citizens Protecting Michigan's Constitution*, 280 Mich App at 286, quoting *Carter v Ann Arbor City Attorney*, 271 Mich App 425, 439; 722 NW2d 243 (2006) (quotation marks omitted).

C. STANDING

We reject CFMMJ's challenge to PMC's standing to bring this action. Michigan jurisprudence recognizes

the special nature of election cases and the standing of ordinary citizens to enforce the law in election cases. *Deleeuw v Bd of State Canvassers*, 263 Mich App 497, 505-506; 688 NW2d 847 (2004). See also *Helmkamp v Livonia City Council*, 160 Mich App 442, 445; 408 NW2d 470 (1987) ("[I]n the absence of a statute to the contrary, . . . a private person . . . may enforce by mandamus a public right or duty relating to elections without showing a special interest distinct from the interest of the public." [Quotation marks omitted.]). The general interest of ordinary citizens to enforce the law in election cases is sufficient to confer standing to seek mandamus relief. See *Citizens Protecting Michigan's Constitution*, 280 Mich App at 282 (permitting a ballot question committee to challenge a petition).

### D. RIPENESS AND THE NEED FOR A THRESHOLD DETERMINATION

Our Supreme Court has recognized that a ballot issue controversy is ripe for review when "it is not dependent upon the Board of Canvassers' counting or consideration of the petitions but rather involves a threshold determination whether the petitions on their face meet the constitutional prerequisites for acceptance." *Michigan United Conservation Clubs v Secretary of State*, 463 Mich 1009; 625 NW2d 377 (2001). See also *Citizens Protecting Michigan's Constitution*, 280 Mich App at 282-283 (rejecting a ripeness challenge that was premised on the fact that the Board had not decided whether to certify an initiative petition). PMC's complaint for mandamus requires us to make a "threshold determination" whether the CFMMJ proposal qualifies for placement on the ballot according to constitutional prerequisites. In that context and on that issue, this case is ripe for adjudication.

We emphasize that the constitutional issue before us is limited to the procedure employed by CFMMJ to alter the Gaming Act by means of a constitutional amendment and the CFMMJ proposal's eligibility for the ballot. We do not consider the constitutionality of the proposed amendment itself, which would be premature before the voters adopt the proposal. See *Leininger v Secretary of State*, 316 Mich 644, 651; 26 NW2d 348 (1947) (noting that substance of initiative petition was not being questioned in writ of mandamus); *Hamilton v Secretary of State*, 212 Mich 31, 34; 179 NW 553 (1920) (holding that issue of constitutionality of initiative petition was not ripe for review). In *Citizens Protecting Michigan's Constitution*, we adopted Justice OSTRANDER's articulation of this important distinction, first expressed in 1918 in *Scott v Secretary of State*, 202 Mich 629, 643; 168 NW 709 (1918), and reaffirmed in *Leininger*:

> In ... *Leininger* the Court carved out an exception to the *Hamilton* rule, holding that a constitutionally fatal defect in an initiative petition supported the issuance of a writ of mandamus prohibiting the Secretary of State from transmitting the proposed law. The *Leininger* Court explained that, unlike in *Hamilton*, "[i]n the case at bar ... we are not concerned with the question of whether the substance of the proposed law is violative of the Federal or State Constitutions. Here the question is whether the petition, in form, meets the constitutional requirement so as to qualify it for transmittal to the legislature and submission to the people." [*Leininger*, 316 Mich] at 651. On this point, the words of Chief Justice OSTRANDER in *Scott v Secretary of State*, 202 Mich 629, 643; 168 NW 709 (1918), are most instructive:
>
> > "Of the right of qualified voters of the State to propose amendments to the Constitution by petition it may be said, generally, that it can be interfered with neither by the legislature, the courts, nor the officers charged with any

duty in the premises. *But the right is to be exercised in a certain way and according to certain conditions, the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution.* [Emphasis added.]"
[*Citizens Protecting Michigan's Constitution*, 280 Mich App at 289.][8]

The same principle applies here, making PMC's request for mandamus a proper subject for this Court's consideration. Because the challenges in this case implicate this "threshold determination" whether the petition meets the constitutional prerequisites for acceptance, this case is ripe for this Court's consideration. *Id.* at 283.

### E. MINISTERIAL DUTY OR DISCRETIONARY JUDGMENT

This Court clarified the nature of the Secretary's legal duty in this context in *Citizens Protecting Michigan's Constitution*. In that original action seeking mandamus relief to keep an initiative from the general election ballot, this Court explained that it was for this Court to examine the constitutional amendment initiative and determine its eligibility for the ballot in light of constitutional prerequisites for acceptance. Once that threshold determination was made, the Secretary's task of rejecting the petition was ministerial.

In *Citizens Protecting Michigan's Constitution*, the plaintiffs sought a writ of mandamus directing the Secretary and the Board of State Canvassers to reject an initiative petition filed by the intervening defendant Reform Michigan Government Now! (RMGN). The petition proposed a single constitutional amendment for the November 2008 general election ballot that would comprehensively restructure state government. *Id.* at

---

[8] *Scott* and *Leininger* interpreted previous versions of our constitution.

275.[9] The plaintiffs argued that the RMGN proposal was ineligible for the ballot because its provisions amounted to a general revision of the constitution that could only be accomplished by a constitutional convention and because the proposal served more than a single purpose. *Id.* at 281-282. This Court recognized a clear legal duty of the Secretary that a writ of mandamus can enforce once the Court makes its threshold determination of constitutional compliance:

> [A]ssuming the Board and the Secretary have no clear legal duty to determine whether the RMGN initiative petition is an "amendment" to, or a "general revision" of, the constitution, or a duty to determine whether the RMGN initiative petition serves more than one purpose, then *this Court* must make the "threshold determination" that the RMGN initiative petition does not meet the constitutional prerequisites for acceptance. And, *at that point*, the Board and the Secretary have a clear legal duty to reject the RMGN petition. *In other words, in this case, our order would not enforce any duty on the part of the Board and the Secretary to make the "threshold determination" whether the RMGN initiative petition is an "amendment" or a "general revision," or whether it serves more than one purpose. Rather, our order would enforce a duty on the part of the Board and the Secretary to reject the RMGN initiative petition in light of our "threshold determination"*

---

[9] The proposed constitutional amendment in *Citizens Protecting Michigan's Constitution* included provisions to: modify initiative and referendum procedures, establish a new office of elections in the executive branch, freely allow absentee ballot voting, reduce the number of legislators in the state house and senate, reduce the number of appellate judgeships and Court of Appeals districts while adding circuit court judgeships, change procedures for legislative districting, reduce salaries and alter pension benefits of certain elected officials, impose limits on lobbying activities, change election procedures for selecting the governor and the lieutenant governor, make changes to the governor's and the Legislature's authority in certain matters, and replace the Judicial Tenure Commission with a new body composed of nonlawyers. *Id.* at 279-281.

*that it does not meet the constitutional prerequisites for
acceptance. [Id.* at 291 (some emphasis added).]

This Court concluded that the subsequent act of the
Secretary in rejecting the challenged initiative petition
after the Court made its threshold determination
"would be ministerial in nature because it would not
require the exercise of judgment or discretion." *Id.* at
291-292. Likewise, this Court must determine whether
the CFMMJ petition satisfies the constitutional re-
quirements for placement on the general election ballot.
The Secretary will then have the ministerial task of
rejecting the petition, or not, in accordance with this
Court's decision.

### F. RELEVANT CONSTITUTIONAL PROVISIONS

Among the rights that the Michigan Constitution
reserves to the people of this state are the right to
amend their constitution, to enact laws by initiative,
and to amend initiated laws. The constitution pre-
scribes different procedures for exercising these rights.

Const 1963, art 12, § 2 allows voters to amend the
constitution by voter initiative as follows:

Amendments may be proposed to this constitution by
petition of the registered electors of this state. Every
petition shall include the full text of the proposed amend-
ment, and be signed by registered electors of the state
equal in number to at least 10 percent of the total vote cast
for all candidates for governor at the last preceding general
election at which a governor was elected. Such petitions
shall be filed with the person authorized by law to receive
the same at least 120 days before the election at which the
proposed amendment is to be voted upon. Any such peti-
tion shall be in the form, and shall be signed and circulated
in such manner, as prescribed by law. The person autho-
rized by law to receive such petition shall upon its receipt
determine, as provided by law, the validity and sufficiency

of the signatures on the petition, and make an official announcement thereof at least 60 days prior to the election at which the proposed amendment is to be voted upon.

Any amendment proposed by such petition shall be submitted, not less than 120 days after it was filed, to the electors at the next general election. Such proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law. Copies of such publication shall be posted in each polling place and furnished to news media as provided by law.

The ballot to be used in such election shall contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption. Such statement of purpose and caption shall be prepared by the person authorized by law, and shall consist of a true and impartial statement of the purpose of the amendment in such language as shall create no prejudice for or against the proposed amendment.

If the proposed amendment is approved by a majority of the electors voting on the question, it shall become part of the constitution, and shall abrogate or amend existing provisions of the constitution at the end of 45 days after the date of the election at which it was approved. If two or more amendments approved by the electors at the same election conflict, that amendment receiving the highest affirmative vote shall prevail.

Const 1963, art 2, § 9 protects the people's right to enact laws through initiative and prescribes the means for amending or repealing a voter-initiated law. Amendment or repeal of an initiated law can only be accomplished "by a vote of the electors unless otherwise provided in the initiative measure or by three-fourths of the members elected to and serving in each house of the legislature." *Id*. Article 2, § 9 provides in full:

The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and

the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.

Any law proposed by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is receive by the legislature. If any law proposed by such petition shall be enacted by the legislature it shall be subject to referendum, as hereinafter provided.

If the law so proposed is not enacted by the legislature within the 40 days, the state officer authorized by law shall submit such proposed law to the people for approval or rejection at the next general election. The legislature may reject any measure so proposed by initiative petition and propose a different measure upon the same subject by a yea and nay vote upon separate roll calls, and in such event both measures shall be submitted by such state officer to the electors for approval or rejection at the next general election.

Any law submitted to the people by either initiative or referendum petition and approved by a majority of the votes cast thereon at any election shall take effect 10 days after the date of the official declaration of the vote. No law initiated or adopted by the people shall be subject to the

veto power of the governor, and *no law adopted by the people at the polls under the initiative provisions of this section shall be amended or repealed, except by a vote of the electors unless otherwise provided in the initiative measure or by three-fourths of the members elected to and serving in each house of the legislature.* Laws approved by the people under the referendum provision of this section may be amended by the legislature at any subsequent session thereof. If two or more measures approved by the electors at the same election conflict, that receiving the highest affirmative vote shall prevail.

The legislature shall implement the provisions of this section. [Emphasis added.]

The Gaming Act does not provide other means for its amendment. Therefore, either a vote of the electorate or a three-fourths vote in each house of the legislature is required to amend the Gaming Act. Const 1963, art 2, § 9.

Clearly, Const 1963, art 2, § 9 and art 12, § 2 prescribe different procedures that must be satisfied before an initiative is submitted to the electorate, depending on the type of initiative. A legislative initiative requires petitions signed by 8% of registered electors; a constitutional amendment requires petitions signed by 10% of registered electors. Unlike a constitutional amendment proposal, a legislative initiative must be submitted to the legislature for adoption or rejection. These constitutional provisions both authorize amendment by a vote of the electors, but they set different procedures for accomplishing these different objectives.

Const 1963, art 4, § 24 mandates that a law can have only one object and must have a title that expresses its object: "No law shall embrace more than one object, which shall be expressed in its title."

The revision, alteration, or amendment of a law implicates the procedures of Const 1963, art 4, § 25. The

law as it exists must be published to show the effect of the proposed changes. Const 1963, art 4, § 25 provides:

> No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length.

This publication requirement applies to the revision or the alteration of a law by the people through the initiative process. See *Auto Club of Mich Comm for Lower Rates Now v Secretary of State (On Remand)*, 195 Mich App 613, 622-624; 491 NW2d 269 (1992) (finding that the failure to republish at length certain statutory provisions in their proposed amended forms may not be considered before the initiative is submitted to the electorate for a vote).

### G. APPLICATION OF THE PREREQUISITES OF CONST 1963, ART 2, § 9

Const 1963, art 2, § 9 and Const 1963, art 12, § 2 prescribe separate procedures for amending voter-initiated laws and for amending the constitution, respectively. They are not interchangeable alternatives. These distinct procedures for different objectives must be respected. *Citizens Protecting Michigan's Constitution*, 280 Mich App at 295. Accordingly, CFMMJ may not use a constitutional amendment under art 2, § 12 to effect an amendment of the Gaming Act. If CFMMJ seeks to amend the Gaming Act, it must satisfy the dictates of art 2, § 9.

On its face, the CFMMJ petition purports only to amend Const 1963, art 4, § 41. As required by article 12, § 2, the petition indicates the language that it proposes to strike from article 4, § 41, as well as the language that the proposed amendment would add. The petition contains no reference to the Gaming Act. Whether disclosure of the CFMMJ proposal's effects on

the Gaming Act is required depends upon whether the CFMMJ proposal is properly deemed an amendment of the Gaming Act.

We need not decide whether the CFMMJ proposal constitutes an *amendment* of the Gaming Act, thereby requiring compliance with the procedures in Const 1963, art 2, § 9 for submission to the voters. The republication requirement of Const 1963, art 4, § 25 applies not only to efforts to *amend* an existing law, but also to proposals that would revise or alter a law. Although similar, principles of construction require us to give meaning to each term, "revise," "alter," and "amend," lest any one of them be rendered surplusage or nugatory. *Apsey v Mem Hosp*, 477 Mich 120, 127; 30 NW2d 695 (2007). To the extent that the CFMMJ proposal revises or alters the Gaming Act, it must comply with Const 1963, art 4, § 25.

### H. APPLICATION OF CONST 1963, ART 4, § 25

As set forth, Const 1963, art 4, § 25 provides that "[n]o law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length." This notice requirement has a long history and its significance is deeply rooted in this state's constitutional jurisprudence. Const 1963, art 4, § 25 was also article 4, § 25 of the 1850 Constitution,[10]

---

[10] Article 4, § 25 of the Constitution of 1850 was worded and punctuated slightly differently than in the current version: "No law shall be revised, altered or amended by reference to its title only; but the act revised, and the section or sections of the act altered or amended shall be reenacted and published at length." "Except for some punctuation and some rearrangement of words in the latter half of the provision, this language has continued through to this date (also see 1908 Cont art 5, § 21, § 22)." *Advisory Opinion re Constitutionality of 1972 PA 294*; 389 Mich 441, 469-470; 208 NW2d 469 (1973).

under which our Supreme Court decided *Mok v Detroit Bldg & Savings Ass'n No 4,* 30 Mich 511 (1875). *Alan v Wayne Co,* 388 Mich 210, 273; 200 NW2d 628 (1972). Justice COOLEY wrote of article 4, § 25 in *Mok*:

> No one questions the great importance and value of the provision, nor that the evil it was meant to remedy was one perpetually recurring, and often serious. Alterations made in the statutes by mere reference, and amendments by the striking out or insertion of words, without reproducing the statute in its amended form, were well calculated to deceive and mislead, not only the legislature as to the effect of the law proposed, but also the people as to the law they were to obey, and were perhaps sometimes presented in this obscure form from a doubt on the part of those desiring or proposing them of their being accepted if the exact change to be made were clearly understood. [*Mok,* 30 Mich at 515-516.]

In *Advisory Opinion re Constitutionality of 1972 PA 294;* 389 Mich 441; 208 NW2d 469 (1973), our Supreme Court reiterated the import of art 4, § 25 in Constitution 1963. The Court interpreted art 4, § 25 in the context of addressing the constitutionality of an amendment to the no-fault act. The Court recognized the significant purpose of § 25 to provide notice to the public of the full effects of a proposed amendment:

> The language of § 25 is quite clear. It says succinctly and straightforwardly that no law (meaning statutory enactment) shall be revised, altered or amended by reference to its title only. The constitutional language then proceeds to state how it shall be done (*i.e.* the section[s] of the act in question shall be amended by reenacting and republishing at length).
>
> There are only two sentences in § 25. Although the second word is "law", it is obvious from the reading of the entire section that "law" means act or section of an act. Section 25 is worded to prevent the revising, altering or amending of an act by merely referring to the title of the

act and printing the amendatory language then under consideration. If such a revision, alteration or amendment were allowed, the public and the Legislature would not be given notice and would not be able to observe readily the extent and effect of such revision, alteration or amendment. [*Id.*, 389 Mich at 470.]

Looking to precedent, the *Advisory Opinion* Court quoted Justice COOLEY in *People v Mahaney*, 13 Mich 481 (1865):

"This constitutional provision must receive a reasonable construction, with a view to give it effect. The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that the legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws." (p 497.)

This citation indicates that another reason for the language in § 25 is to require that notice be given to the Legislature and the public of what is being changed and the content of the act as revised, altered or amended. . . .

\* \* \*

"An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to but not republished, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was introduced into the law, and the constitution wisely prohibited such legislation." [*Advisory Opinion*, 389 Mich at 472-473, quoting *Mahaney*, 13 Mich at 497.]

The effects of the proposed constitutional amendment on the Gaming Act are not minor. If adopted, the CFMMJ proposal will significantly limit, suspend, or invalidate specific provisions of the statute. Among other changes to the Gaming Act, the constitutional

amendment will authorize more casinos than the Gaming Act allows, increase the wagering tax rate, change the statute's allocation of tax revenues, remove the Gaming Act's requirement that casinos' liquor licenses be issued according to the liquor control act and instead mandate such licenses, and alter the duties of the Michigan Gaming Control Board. If Michigan voters are presented with and adopt the CFMMJ proposal, the constitutional amendment will supersede numerous provisions of the Gaming Act because the authority of a constitutional amendment is superior to statutory authority. See *Dunn v Dunn*, 105 Mich App 793, 805; 307 NW2d 424 (1981) (noting that when statutes conflict with our constitution, the latter controls) (KALLMAN, J., concurring). Although the CFMMJ proposal does not amend the Gaming Act by changing its language, the proposal nonetheless thoroughly revises the Act.

If the CFMMJ proposal is allowed to be placed on the ballot, not only would it run afoul of the republication requirement of Const 1963, art 4, § 25, but it would foster the harm that § 25 seeks to prevent. The constitutional amendment would substantially change the Gaming Act, yet the public "would not be given notice and would not be able to observe readily the extent and effect of such revision, alteration, or amendment." *Advisory Opinion*, 389 Mich at 470.

The CFMMJ petition does not publish at length the sections of the Gaming Act that the proposed constitutional amendment would alter as required by Const 1963, art 4, § 25. The petition contains no reference to the Gaming Act. The petition heading states only that it proposes a constitutional amendment; the petition discloses nothing about the substantial changes to the application and enforcement of the Gaming Act that would result from adoption of the proposal. Indeed, the

petition gives no indication to voters that the CFMMJ proposal would alter parts of the voter-initiated Gaming Act in any way. Because the proposed amendment would directly alter provisions of the Gaming Act without republishing the affected provisions, the CFMMJ proposal fails to satisfy Const 1963, art 4, § 25. This failure makes it ineligible for placement on the ballot.[11]

We neither address nor consider the wisdom of the CFMMJ proposal. Whether the goals of the CFMMJ proposal are desirable, or whether its changes to the Gaming Act are sound policy, are not before us. We simply apply the procedural requirements that the constitution demands.

Our decision today gives effect to the publication requirement of Const 1963, art 4, § 25 and furthers its purpose of ensuring that the public is informed of the effects of proposed changes to existing law. By giving effect to article 4, § 25, the public will be assured of the opportunity to "mak[e] the necessary examination and comparison" and "to become apprised of the changes made in the laws." *Advisory Opinion*, 389 Mich at 472-473. This constitutional safeguard is as crucial to the people's exercise of their right to amend their constitution, perhaps more so, as it is to their use of the initiative to enact or amend existing law.

We grant the relief requested in the complaint for a writ of mandamus, and we have concurrently issued an order directing the Secretary to reject the CFMMJ petition and to disallow the proposal from the ballot.

---

[11] The Attorney General stated at oral argument that amending both the constitution and an initiated law would require separate petitions. Whether two petitions would be necessary to accomplish CFMMJ's casino gaming expansion goals, or whether one petition would suffice if that petition republished both the Gaming Act provisions and constitutional provisions that the CFMMJ proposal would affect, is not before us. Accordingly, we leave that question for another day.

No costs, a public question being involved. We do not retain jurisdiction. This opinion is to have immediate effect, MCR 7.215(F)(2).

OWENS, P.J., concurred with O'CONNELL, J.

RONAYNE KRAUSE, J. *(concurring in part and dissenting in part)*. This is another unfortunate case throwing into sharp relief two longstanding problems with the Michigan referendum process: first, poor drafting can preclude the people of this state from being able to express their will at the polls; and second, the Secretary of State needs clearer authority explicitly stating its duties, if any, to filter ballot proposals that do not conform to the requirements of our Constitution. I do not take issue with the majority's conclusion that the ballot initiative at issue in this matter does not, in fact, conform to the requirements of our Constitution for presentation to the voters. I also agree that the Secretary of State has a clear legal duty to evaluate ballot proposals for such compliance. To the extent the writ of mandamus issued by this Court directs the Secretary of State to perform her duty, I concur with it. However, because I believe that this Court lacks sufficiently clear authority granting it the power to make the Secretary of State's decision for her under these circumstances, I respectfully dissent to the extent that the writ of mandamus dictates the Secretary of State's ultimate decision.[1]

As the majority states in greater—and accurate—detail, this is an original mandamus action filed in this Court by Protect MI Constitution (PMC), an entity that seeks to preclude a ballot initiative from being put to

---

[1] In addition, I specifically concur in parts IV(C) and (D) of the majority's opinion, rejecting standing and ripeness challenges to the instant appeal.

the voters. The ballot initiative in question, sponsored by intervenor Citizens For More Michigan Jobs (CFMMJ), would in broad terms amend the Michigan Constitution to permit additional casinos to operate in this state. PMC asserts that the ballot initiative would not merely amend the Constitution, but would also have the effect of modifying significant portions of the Michigan Gaming Control and Revenue Act (the Gaming Act), MCL 432.201 *et seq.*, which was passed by voter initiative in 1996.[2] Defendant, the Secretary of State, argues that a writ of mandamus should not issue because she has no clear legal duty to examine ballot initiatives for compliance with Constitutional prerequisites.

As the majority states, a writ of mandamus "is the appropriate remedy for a party seeking to compel action by election officials," and the Secretary of State is a state officer subject to a writ of mandamus issued by this Court. *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 282-283; 761 NW2d 210 (2008). Indeed, it has long been established that while the Governor might be immune to mandamus, other executive officers, including department heads, are not. See *People ex rel Sutherland v Governor*, 29 Mich 320, 326-331 (1874). However, issuance of mandamus is only proper if, among other things, "the defendant has the clear legal duty to perform the act requested," "the act is ministerial," and "no other remedy exists that might

---

[2] Under the procedural posture of this case, I would decline to address whether the proposed ballot initiative actually would impermissibly alter provisions of the Gaming Act, and therefore violates the prerequisites of Const 1963, art 4, §§ 24 and 25. However, while irrelevant to the analysis in which I would engage, I note as an aside that I do agree with the majority that it does so, and so I take no issue with parts IV(F), (G), and (H) of the majority's opinion. I merely would not reach them at this time.

achieve the same result." *Citizens Protecting Michigan's Constitution*, 280 Mich App at 284. The Secretary of State argues that evaluating a ballot proposal for constitutionality entails a great deal of discretion, and she has no legal duty to make that analysis.

I am not convinced that the act to be performed— examining an initiative proposal for compliance with constitutional prerequisites—is not ministerial. This Court has explained that an act is ministerial if it is "prescribed and defined by law with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Id.* at 286, quoting *Carter v Ann Arbor City Attorney*, 271 Mich App 425, 439; 722 NW2d 243 (2006) (quotation marks and citations omitted). However, I do not believe that to mean that the act must be so rote or devoid of personal thought that it could literally be performed by a computer. See *Wayne Co v State Treasurer*, 105 Mich App 249, 251; 306 NW2d 468 (1981) (noting that the legal duty to act must usually be a specific act of a ministerial nature, although mandamus may occasionally be granted when the act to be compelled is discretionary). So long as any discretion to be exercised is in the *execution* of the act, and the act *itself* is otherwise mandated, mandamus may lie. See *Mich State Dental Society v Secretary of State*, 294 Mich 503, 516-517, 519-520; 293 NW 865 (1940) (holding that the Secretary of State's duties, which are only ministerial even though the performance thereof may entail some exercise of discretion and judgment, include the right to make a facial evaluation of obviously fake names on a petition). This Court will order mandamus when a state officer's action is so capricious and arbitrary that it evidences a total failure to exercise discretion. See *Bischoff v Wayne Co*, 320 Mich 376, 385-387; 31 NW2d 798 (1948).

The critical problem that I perceive with the instant action is that, as I understand the law, a writ of mandamus cannot issue unless there *already* exists a clear legal duty that a defendant is shirking. Obviously, the Secretary of State would be obligated to comply with any valid court order, including a writ of mandamus issued by this Court, and the Secretary of State does not in any way contest that. However, this Court cannot *create* a clear legal duty of the sort that would support issuance of mandamus *by* issuing mandamus. Doing so is bootstrapping of the kind our jurisprudence has always frowned upon. The Secretary of State poses a Catch-22: if, indeed, she has no clear legal duty in the first place to make the instant determination on her own, I do not believe this Court can *create* that duty out of thin air by issuing a writ of mandamus.

Unfortunately, I find no case law or other authority unambiguously setting forth a clear legal duty on the Secretary of State's part to evaluate a ballot proposal for compliance with the Constitutional provisions at issue here. In *Citizens Protecting Michigan's Constitution*, this Court issued a writ of mandamus directing the Secretary of State to reject a sweeping and grossly noncompliant rewrite of the Constitution that was masquerading as a mere amendment. However, this Court did not decide that the Secretary of State had a clear legal duty to do so, but rather assumed that the Secretary did. *Citizens Protecting Michigan's Constitution*, 280 Mich App at 286-292. Similarly, in *MUCC v Secretary of State (After Remand)*, 464 Mich 359; 630 NW2d 297 (2001), our Supreme Court issued mandamus directing the Secretary of State to reject a petition for referendum but offered no analysis whatsoever as to the existence of a duty. Almost every justice in *MUCC* wrote a separate opinion, none of which discussed mandamus in any way.

It appears to me that this Court in *Citizens Protecting Michigan's Constitution* really determined that the Secretary of State would have a clear legal duty to comply with what was effectively a declaratory judgment. I believe that to be accurate, so far as it goes: if a court were to issue a declaratory judgment that a given ballot initiative is impermissible for presentation to the voters, for example because, as here, it does not comply with the constitutional prerequisites, then it is very nearly, if not actually, axiomatic that the Secretary of State would have a clear legal duty to refuse to present that initiative to the voters. However, this Court does not, as far as I am aware, have jurisdiction to entertain original actions for declaratory judgment. MCR 7.203(C).[3] This Court could grant "any judgment . . . as the case may require" pursuant to MCR 7.216(A)(7), which would impliedly include granting declaratory relief. However, that does not appear to have occurred. Mandamus and declaratory judgments are not exactly the same thing; and because this Court does not appear to have the jurisdiction to entertain an original action for declaratory relief, I would not consider one.

Our Supreme Court has, in the past, found a clear legal duty on the part of the Secretary of State, leading to writs of mandamus, to evaluate ballot proposals for facial compliance with constitutionally mandated technical requirements. In *Leininger v Secretary of State*, 316 Mich 644, 651-656; 26 NW2d 348 (1947), our Supreme Court explicitly established that the Secretary of State has a clear legal duty to determine whether petitions were in the proper constitutionally required form for transmit-

---

[3] Obviously, it would be possible to establish that this Court may entertain an original action for declaratory relief in the specific context of determining whether ballot initiatives are permissible, pursuant to MCR 7.203(C)(5). To the best of my knowledge, this has not occurred.

tal to the Legislature. *Leininger* is of dubious direct validity today, however, because at the time, article V, § 1 of the 1908 Constitution, as amended by 1941 Joint Resolution 2, imposed an *explicit* duty on the Secretary to do so. *Leininger*, 316 Mich at 655. However, *Leininger* relied primarily on another case that predated 1941 JR 2, and it noted that the Constitution merely "now makes express the duty which this Court had theretofore held rested upon the Secretary of State." *Leininger*, 316 Mich at 655.

The prior case is *Scott v Secretary of State*, 202 Mich 629; 168 NW 709 (1918). Although *Scott* predates 1941 JR 2, it was decided after the 1908 Constitution was amended to provide for a referendum process by 1913 Concurrent Resolution 4.[4] The 1913 to 1941 version of Const 1908, art V, § 1 did not provide the explicit directive to the Secretary to "determine[]that the petition is legal and in proper form and has been signed by the required number of qualified and registered electors," as it did after 1941 JR 2, as noted in *Leininger*. Rather, it specified only that "[u]pon receipt of any initiative petition, the Secretary of State shall canvass the same to ascertain if such petition has been signed by the requisite number of qualified electors" and transmit it to the Legislature if so. 1913 CR 4. *Scott* observed that the same constitutional provision required all petitions to contain "the full text of the amendment so proposed," and on that basis, it held that "such petition" had to be defined as one "conforming to the constitutional mandate." *Scott*, 202 Mich at 644. If a petition did not satisfy the constitutional requirements, it was

---

[4] The original, "as ratified" version of Const 1908, art V, § 1 stated only that "[t]he legislative power is vested in a senate and house of representatives," and this original version of that section is now found at Const 1963, art 4, § 1.

therefore the duty of the Secretary to reject it. *Scott*, 202 Mich at 643-646; see also, *Hamilton v Secretary of State*, 212 Mich 31, 38-40; 179 NW 553 (1920) (discussing *Scott*).

I would find that, while Michigan has a new Constitution, the principles discussed in *Scott* and expounded upon in *Leininger* are still valid and binding. I would therefore explicitly hold that the Secretary of State has a clear, unambiguous, affirmative legal duty to evaluate ballot initiatives for facial compliance with the technical formalities dictated by the Constitution. However, I find authority only supporting the bare obligation by the Secretary of State to make that evaluation. Should the Secretary of State find that the ballot proposal is or is not compliant, and thereby decide whether to place it on the ballot, the Secretary of State's decision will then be reviewable by an appeal to the courts. See *Leininger*, 316 Mich at 652, citing *Hamilton*, 212 Mich at 38, and *Thompson v Secretary of State*, 192 Mich 512, 523-524; 159 NW 65 (1916). Alternatively, one or more of the parties should have commenced an action seeking declaratory relief.

I recognize that there are time constraints on the subject matter of this case. However, I do not believe that those time constraints change the law. I note that at oral argument, the Solicitor General agreed on the record that the Secretary of State is obligated to make this decision, but asked this Court to make that decision *for* the Secretary of State because of those time constraints. I do not believe that in the absence of any clear authority to the contrary, such as that from our Legislature or from our Supreme Court, this Court may do so until such time as the Secretary of State has made a decision.[5] Indeed, at oral

---

[5] Furthermore, I am not persuaded that the time constraints are as dire as suggested. The courts may conclude that legislation is impermissible *after* voting has occurred, and the people may well vote against this

argument, the possibility of clarifying legislation was discussed, and I would very much like to have such clear authority on which to rely.[6] However, in the absence thereof, I can only surmise the courts could address the issue through a complaint for declaratory judgment.

Where the majority and I part ways is that I would issue a writ of mandamus directing the Secretary of State to make this decision; the majority would relieve the Secretary of her duty and issue a writ of mandamus making this decision for her. I believe that the Secretary of State has a clear legal duty, independent of any decision or judgment from this Court, to evaluate ballot initiatives for facial compliance with the procedural requirements specified by the Constitution, and we can therefore issue a writ of mandamus requiring the Secretary of State to carry out that duty. If a court, such as this Court, issues a declaratory judgment that a ballot initiative is or is not constitutionally infirm, *then* the Secretary of State has a clear legal duty to take a particular action to accept or reject the initiative and present it to the voters. But I believe the majority's approach conflates the matter and impermissibly treats this case as not only an original action for mandamus, but also an original action for declaratory judgment. I appreciate the majority's concern, given the nature of the ballot initiative at issue, but in the absence of a clearer articulation of this Court's authority and the Secretary of State's duty from our

particular initiative. In any event, PMC candidly points out, and I agree, that no matter what this Court does, at least one party *will* seek leave to appeal to our Supreme Court. It is my hope and my respectful request that if our Supreme Court chooses to review this matter, that it take the opportunity to benefit the bench, the bar, the Secretary of State, and the people of this state by clarifying the concerns I have raised.

[6] As noted earlier, I agree with the majority's analysis of the ballot initiative's constitutional infirmities, but I am unsure that this Court may properly reach that analysis under the instant procedural posture of this case.

Supreme Court or from the Legislature, I would only
direct that the Secretary of State engage in the analysis
that she was obligated to engage in from the outset.